No. 65,930

STATE OF KANSAS, *Appellee,* v. RUFUS McDONALD, *Appellant.*

(824 P.2d 941)

Opinion filed January 17, 1992.

*Elizabeth Sterns*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Terra D. Morehead*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

Six, J.: This criminal case considers claims of trial court abuse of discretion. Rufus McDonald was found guilty by a jury of one count of rape. K.S.A. 21-3502. He was sentenced to a term of 15 years to life. McDonald claims the trial court abused its discretion by denying his motion for a three-hour continuance and by imposing a sentence of 15 years to life. He also asserts error in the method of sentencing. A fourth claim for reversal is based on the sufficiency of the evidence.

Our jurisdiction is under K.S.A. 1990 Supp. 22-3601(b)(1), the imposition of a maximum sentence of life imprisonment.

We find no error and affirm.

### Facts

W.M. was a 32-year-old woman who had progressive muscular dystrophy. She was confined to a wheelchair and had weakened arms and only limited control of her body functions. She also suffered from a seizure disorder. Following a seizure, W.M. appears to be asleep, experiencing a post-digital state lasting from one to five hours. During this state, she can be awakened; however, she has no control. When awakened, she is tired and embarrassed.

On July 31, 1989, W.M. reported to the police that she had been raped. She was taken to a hospital for examination. The responding officer, Sharon Ervin, testified that W.M. was upset and crying. W.M. named McDonald as the assailant.

### W.M.'s Testimony

W.M. first met McDonald on July 4, 1989. She was outside her house watching her son shoot off fireworks. McDonald drove up in a car and asked her if she knew a particular address. He asked if he could visit her. W.M. and McDonald played cards

on the porch that evening. W.M. told him that she had worked at Medicalodge South 11 or 12 years ago. He claimed to have worked there at the same time and said he remembered W.M. W.M. did not remember McDonald.

McDonald returned the next day. W.M. was upset because her sister had died. W.M. told McDonald she did not want to talk to him. A few days later, McDonald told her she needed to get out of the house. He took her for a drive. McDonald came over quite often during the next two weeks. He would simply show up. W.M. and McDonald would play cards and talk. W.M. enjoyed his visits at first. McDonald never told W.M. that he was married and had a child.

One evening, W.M. had a seizure when she and McDonald were playing cards. She was in her wheelchair in the dining room. Later she remembered waking up on the floor. Her diaper was off. McDonald asked her if she had any contagious diseases. She said no. McDonald then asked her if they could have sex. She said no; she was tired and wanted to go to bed. While W.M. was still on the floor, McDonald moved on top of her and had sex. She was too tired to fight or scream because she had just had a seizure. McDonald then put her on the sofa and left.

W.M.'s friend and neighbor, Ra, arrived later. W.M. was ashamed and did not tell Ra about the incident.

A day or two later, Carol Byrd, W.M.'s therapist, sensed something was wrong and, upon questioning, W.M. told Byrd of the rape. Byrd encouraged W.M. to report the incident. W.M. did not report it because she was confused about what was going on during the incident and she was ashamed.

Before this incident W.M. did not normally lock her doors in order that friends and nurses could come in and out easily. Following the incident, she began locking her doors and gave keys to those who needed them.

McDonald came by W.M.'s house a week later. W.M.'s brother had just left and did not lock the door behind him. McDonald walked in. W.M. called Ra, who came right over. When Ra arrived, the door was locked, and McDonald let Ra in.

About a week later, W.M.'s neighbor Pilar Tapia, who had a key to W.M.'s house, had come and left but neglected to lock the door upon leaving. W.M. had an accident and went into a

bedroom to change her diaper. W.M., thinking the door was locked, took off her dress, undid her diaper, and tried to move over onto the bed. McDonald walked in. She asked him how he got in; McDonald told her the door was unlocked. W.M. informed McDonald that Ra would be there soon and that she did not want his help.

McDonald put her on the bed, spread her legs apart, and asked her if she had had sex since their last time. W.M. said no. She was crying. He asked her why she was crying. She responded, "Because I told you no." She testified he was on her and put his penis inside her. She told him no and hit him on the shoulders. McDonald left, stating he would come back after her friend left.

After McDonald left, it took W.M. 45 minutes to clean up, dress, and move into her wheelchair. She was afraid to stay in her house. She left in the wheelchair to go to her neighbor's (Lorraine's) house. On the way, she met another neighbor, Dwayne Carpenter. W.M. was crying. Carpenter took her to Lorraine's. W.M. then reported the incident.

<u>Corroborating Evidence</u>

Ra testified that she went to W.M.'s house almost every night at around 10:30. She would usually stay until 1:00 or 2:00 in the morning. They would talk and watch TV. Ra testified that one night she came by and W.M. was on the sofa. W.M. would not talk much, kept covering her head, and would not permit her diaper to be changed by Ra. Ra asked what was wrong but W.M. would not tell her. Ra kept asking W.M. and a couple of days later W.M. told Ra about the first incident with McDonald. Ra testified that after the first incident W.M.'s door was kept locked at night. One occasion, after the first incident, W.M. called Ra to let her know McDonald was there. Ra went over to W.M.'s house. The dead bolt was locked. She was let in by McDonald, who left later.

Carol Byrd testified at trial. Byrd was a physical therapist who worked with W.M. in July 1989. Byrd visited W.M. two to three times each week. In mid-July, Byrd noticed that W.M. was upset. Byrd kept asking W.M. to tell her what was wrong. W.M. began sobbing and told Byrd she had been assaulted. Byrd instructed

her to report the incident to police. W.M. was afraid and asked Byrd not to tell anyone. Byrd testified that W.M.'s door was kept unlocked before the incident. After the incident, the door was kept locked and a neighbor would let Byrd in.

Carpenter testified that he saw W.M. on July 31, 1989. He said W.M. looked as if she was having an asthma attack. He asked what was wrong. W.M. said someone had hurt her and asked Carpenter to take her to Lorraine's house.

Rita Dole, a forensic examiner, testified she had examined vaginal swabs taken from W.M. at the hospital and an adult diaper recovered from W.M.'s house. Dole found seminal fluid on the vaginal swabs and on the diaper. Dole also received and tested blood and saliva samples taken from McDonald. Dole concluded that 87.2% of the Caucasian population and 78.8% percent of the black population would be included as possible contributors of the seminal fluid. McDonald was a possible contributor. The laboratory tests could not exclude McDonald as a contributor.

## McDonald's Statement

McDonald was advised of and waived his rights. His statement was tape-recorded, transcribed, and signed. The statement was read at trial.

McDonald stated that he had recently met W.M. She told him about her hard times and about people taking advantage of her. He said he would go by W.M.'s home once a week or every two weeks. According to McDonald, W.M. once had a seizure and he called an ambulance. He initially stated he had never had sex with W.M. An officer asked McDonald if there was anything else he would like to add to his statement at that time. McDonald responded: "That's all I know, what I'm telling you. That's all I have to say. As far as coming down and raping a woman, I didn't rape her. I went over from time to time to help her out, but I never would of thought of raping her because I know the woman is very ill and I was just helping her out."

The officer left the room to obtain a form for a waiver of search to take body samples. When he returned, McDonald related additional information. McDonald stated that he had not been truthful and that he had "made love" to W.M. two or three

times. However, it was not rape. McDonald said W.M. always consented to having sex.

## McDonald's Testimony

McDonald stated he had never been convicted of a felony, and only a ticket for obstructing an officer was on his record. He first met W.M. when he asked her for help in finding someone's house. McDonald and W.M. started talking. He returned later and stayed for 2 or 3 hours. He came back the next day, and W.M. invited him into her house to play cards. He went in, she started to make a move for him and grabbed his chest, and they had sex. He came back a week later. They talked, played cards, and had sex again. W.M. initiated the sex.

McDonald stated the third time they had sex was following one of W.M.'s seizures. He was at W.M.'s house playing cards when the seizure occurred. McDonald called the KARE unit. After the KARE unit left (he testified the KARE unit reported she would be all right), he put her on the couch. Fifteen or twenty minutes later, W.M. called him over to the couch and said she wanted to have sex.

According to McDonald, the fourth and final time they had sex, W.M. and he were watching TV. W.M. went into her son's room and stayed a long time. When McDonald entered the room, W.M. was laying on the bed attempting to put her clothes on. He asked her if she wanted to have sex. She said, "Sure." They had sex. While they were having sex, he referred to her by using the name of another female. She did not appear to be mad because of his mistake.

McDonald testified he initially denied having sex with W.M. in his statement to police because she was handicapped and he was married.

The State cross-examined McDonald (1) about four misdemeanor convictions (after McDonald stated on direct that he only had one misdemeanor conviction), (2) about his statement that he and W.M. had only had sex two or three times, and (3) about a verified defense document filed with the court indicating that McDonald had had sex with W.M. on July 4, 9, 30, and 31, 1989. The dates did not correspond with McDonald's trial tes-

timony. McDonald responded that the dates in the document were not correct.

### McDonald's Motion for Continuance

McDonald presented the testimony of two character witnesses, a cousin and an uncle. McDonald then moved for a continuance until the next day, because the process server had been unable to serve a subpoena on Mike Tapia, a next door neighbor of W.M. The continuance motion was made on the afternoon of December 12, 1989, the second day of trial. McDonald's counsel told the court that counsel had talked to Tapia and that Tapia could testify that McDonald was at W.M.'s house many times until 1:00 or 2:00 in the morning. Defense counsel stated that the process server attempted to serve Tapia two or three times and left a card. According to defense counsel, the process server thought Tapia was home but Tapia had refused to come to the door and receive the subpoena.

The State objected to a continuance, arguing that the first attempt at service was the previous day and that, because the defense had ample opportunity to subpoena Tapia, there was no reason for delay. The trial court denied the continuance.

McDonald argues that the trial court abused its discretion by denying his motion for continuance. McDonald asserts he made his motion on the afternoon of Tuesday, December 12, 1989, and only requested a continuance until the following morning. McDonald characterizes this request as a request for a "mere three-hour" continuance. He contends Tapia, the intended witness, was deliberately avoiding service. In addition, McDonald argues it was unfair to grant the State's request for a three-week continuance (the prosecutor was to be out of the state on the date of the initial trial setting) while denying his request for a continuance until the following morning.

The State counters: (1) There is no evidence to support McDonald's contention that Tapia was intentionally avoiding the process server; (2) even if an abuse of discretion is shown, McDonald's rights were not prejudiced; (3) McDonald cannot show that Tapia's testimony would have changed the outcome of trial; and (4) the sole issue was whether the incident was rape or consensual sex, and Tapia was not an eyewitness.

K.S.A. 22-3401 provides in part: "Continuances may be granted to either party for good cause shown." In a criminal case, the granting or denial of a continuance rests in the sound discretion of the trial court. The ruling of the trial court will not be disturbed on appeal absent a showing of an abuse of discretion and a showing of prejudice to the substantial rights of the defendant. *State v. Dunn*, 243 Kan. 414, 427, 758 P.2d 718 (1988). Discretion is abused only where no reasonable person would take the view adopted by the trial court. *State v. Haislip*, 237 Kan. 461, 471, 701 P.2d 909 (1985). When a party seeks a continuance due to the absence of a witness, the party must show due diligence to procure the witness' testimony. *State v. Jones*, 226 Kan. 503, 509, 601 P.2d 1135 (1979).

In *Jones*, defense counsel requested a continuance until the next day. The defendant had been charged with aggravated robbery. The proffer stated the witness had a clear view of the robber exiting the building, the witness saw no gun, and the robber had a goatee. The defendant had presented testimony that he was cleanshaven on the day of the robbery. We reversed, noting the defendant's diligence in attempting to procure the witness and that the witness' testimony was crucial. 226 Kan. at 509-10.

In *State v. Maxwell*, 234 Kan. 393, 672 P.2d 590 (1983), defense counsel unsuccessfully attempted to have a subpoena served on a police officer on the second day of trial in a prosecution for aggravated robbery. The defense moved for a continuance, which was denied. The defendant was apprehended when a Ms. Speed was arrested as a result of an altercation with another woman. Speed had in her possession evidence of the aggravated robbery, including stolen property. She gave the police the defendant's name. At trial, the defendant testified that Speed claimed she had tried to kill someone. Speed denied this assertion at trial. The subpoenaed police officer was expected to testify Speed claimed to have threatened to kill someone. Thus, the officer's testimony was to be offered to attack Speed's credibility. We found no abuse of discretion in the denial of the continuance.

The instant facts place the case at bar between *Maxwell* and *Jones*. McDonald filed the subpoena on Friday, December 8, 1989. The process server received the subpoena on the same day. McDonald alleged the first attempt at service was Monday, De-

cember 11, 1989, for a Tuesday morning appearance. McDonald knew at 9:00 a.m. Tuesday morning that service had not been made but did not notify the court until that afternoon.

McDonald's counsel proffered that Tapia would testify Tapia had seen McDonald at W.M.'s house as late as 1:00 to 2:00 a.m. W.M. had testified that McDonald did not stay past 10:30 or 11:00 p.m. On direct examination, McDonald stated, "I would stay over there—she testified the latest I stayed was 10 o'clock. I hardly ever stayed over 15 or 20 minutes." Tapia's testimony relates to a collateral matter (McDonald's theory that he had a relationship with W.M.) not directly bearing on the issue of W.M.'s consent. Tapia's proffered testimony does not support the contention that W.M. consented to have sex.

The trial court did not abuse its discretion in denying the continuance.

### The Wyandotte County District Court's Method of Sentencing

McDonald asserts that he was sentenced by a three-judge board of probation which lacked authority to impose sentence.

The parties acknowledge that our decision in *State v. Blackmore*, 249 Kan. 668, 822 P.2d 49 (1991), controls this issue. Here, as in *Blackmore*, the sentencing procedure was conducted by one judge. We find no error in the method of sentencing. Under Kansas statutes, it is not required that the trial judge be the sentencing judge. Any judge of the judicial district is authorized to pronounce sentence on a person convicted of a crime in that district.

No error is found in the method of sentencing.

### The Sentence—A Term of 15 Years to Life

McDonald asserts that the trial court failed to consider the K.S.A. 21-4606(2) sentencing factors. McDonald points to the following facts, which he alleges demonstrate that the trial court abused its discretion by sentencing him to the maximum sentence: (1) This conviction was his first felony conviction; (2) the presentence investigation (PSI) report recommended a minimum sentence; (3) McDonald was 26 years old when the offense occurred; (4) he is married with two children (one born since the incident); and (5) he had an ongoing relationship with the victim.

The State argues that the trial court had obtained the PSI report. Although the PSI report recommended a minimum sentence, the trial judge, referring to the PSI report and the violent nature of the act, sentenced McDonald to the maximum sentence. The sentence fell within the statutory guidelines. There was no abuse of discretion.

McDonald addressed the panel at the sentencing hearing and requested probation. He stated that this was his first felony conviction and denied committing the crime. He told the court he had a wife and two children and that he had no time to be locked up.

W.M. addressed the panel. She stated the incident was hard to go through. She is scared of men touching her and jumps when someone is near. She still had nightmares and did not know when she was going to get over the incident.

The State recommended the maximum sentence. The recommendation was based on the fact that McDonald took advantage of someone who was emotionally and physically vulnerable.

Judge Lamar, of the panel, sentenced McDonald to the maximum term of 15 years to life "for the reasons of the violent nature of this crime and as set forth in the P.S.I. mentioned."

It is the sentencing judge alone who determines the appropriate sentence or other disposition of the case. The sentencing judge determines the sentence by exercising his or her best judgment, common sense, and judicial discretion after considering all of the reports, the defendant's background, the facts of the case, and the public safety. A sentence imposed within the statutory guidelines will not be disturbed on appeal if it is within the trial court's discretion and not a result of partiality, prejudice, oppression, or corrupt motive. *State v. Heywood,* 245 Kan. 615, 617-18, 783 P.2d 890 (1989).

K.S.A. 21-4606(2) sets forth seven factors which, while not controlling, are to be considered by the court in fixing the minimum term of imprisonment which is consistent with the public safety, the needs of the defendant, and the seriousness of the defendant's crime. When the sentence exceeds the minimum, it is the better practice for the sentencing court to place a detailed statement of facts and factors it considered on the record. Failure to do so does not necessarily indicate the sentencing court abused

its discretion. Each case is to be considered on its facts. *State v. Meyers,* 245 Kan. 471, 479, 781 P.2d 700 (1989).

In *Meyers,* we held that the trial court met the minimum requirements of K.S.A. 21-4606 by obtaining the PSI report, which addressed the factors, and inquiring if there were any errors in the PSI report. 245 Kan. at 479.

McDonald's sentence of 15 years to life is within the statutory guidelines. K.S.A. 21-4501(b). Although this was McDonald's first felony conviction, the PSI report indicates prior criminal activity. The harm caused to W.M. was severe. McDonald's conduct was without provocation. There are no grounds excusing or justifying McDonald's conduct. The victim did not facilitate or induce the crime's commission. McDonald has not, and cannot, compensate W.M. for her emotional injury. Given the nature of the crime, a repeated sexual assault of a defenseless, handicapped woman, McDonald has not shown that his sentence is an abuse of discretion.

## Sufficiency of the Evidence

McDonald contends that there was insufficient evidence to find him guilty beyond a reasonable doubt. Specifically, he argues the State failed to show lack of a consent. McDonald acknowledges that W.M. testified she did not consent. However, McDonald argues that W.M.'s own testimony that she does not have a good memory and that after a seizure she does not know anything renders W.M.'s testimony insufficient to establish his guilt. McDonald's argument is not persuasive.

"When the sufficiency of the evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Graham,* 247 Kan. 388, 398, 799 P.2d 1003 (1990).

In the case at bar, there was sufficient evidence for the jury to find beyond a reasonable doubt that W.M. did not consent.

Affirmed.