No. 66,256

STATE OF KANSAS, *Appellee*, v. MARK W. ZIMMERMAN, *Appellant*.

(833 P.2d 925)

Opinion filed May 22, 1992.

*Hazel Haupt*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Thomas J. Bath*, assistant district attorney, argued the cause, and *Richard G. Guinn*, assistant district attorney, *Paul J. Morrison*, district attorney, and *Robert T. Stephan*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Mark W. Zimmerman, from his convictions of aggravated kidnapping, aggravated burglary, attempted rape, and aggravated assault. The defendant contends the evidence is insufficient to sustain his convictions of aggravated kidnapping and attempted rape. He also argues the trial court erred in failing to suppress statements he gave, in refusing to question the jurors during the trial concerning a newspaper article, and in refusing to furnish the names and addresses of the jurors to defense counsel at a post-trial motion hearing.

The victim in this case, D.Y., was visiting at the apartment of a friend and co-worker. Also present was the co-worker's boyfriend. The three drank beer and swam. They returned to the co-worker's apartment and ordered a pizza delivered. While the co-worker and her boyfriend were in other areas of the apartment, D.Y. put on a pair of shorts over her swimsuit and relaxed in the winged-back chair in front of the television set. She was visible from outside the apartment. D.Y. either fell asleep or passed out.

While the co-worker was in the bathroom area getting towels for her boyfriend, she heard a noise. She assumed the pizza had arrived. Her boyfriend also heard a noise, which he described as "a thump-type noise like something hitting the floor." He suggested that the co-worker check on D.Y.

When the co-worker reached the living room area, she noticed D.Y. was missing and called, "[D.], where are you?" A few seconds later, she saw a man, whom she later identified as the defendant, Mark Zimmerman, "pop out" of the kitchen. The co-worker asked Zimmerman if he was delivering the pizza. Zimmerman's only response was to put a gun to her head and "waltz" her through the apartment until he reached the sliding glass door to the patio and exited the apartment.

In response to the co-worker's call for help, her boyfriend arrived in the main area of the apartment in time to see someone

leaving. He looked out the window and saw someone running to a car. The boyfriend was able to provide the police with a description of that car.

The co-worker and her boyfriend found D.Y. lying on her back on the floor between the washer and dryer in the laundry room adjacent to the kitchen. D.Y.'s shorts had been pulled down. They moved D.Y. back to the winged-back chair in the living room. At that point, they discovered D.Y. had a head wound.

D.Y. testified that the first thing she remembered after falling asleep in the winged-back chair was waking up in the same chair with her head bleeding. She had no recollection of how she received the blow to the back of her head or of being moved to the laundry room and then back again to the living room.

Some 28 days later, the police arrested and interviewed Zimmerman for charges arising out of a different incident. During the interview, Zimmerman admitted his involvement in the incident involving D.Y. Zimmerman told the police he had entered the apartment through an unlocked door. He said he entered the apartment to steal a purse sitting on the kitchen counter. He admitted striking D.Y. over the head with his pistol, dragging her toward the kitchen, and pulling down her shorts. Zimmerman said D.Y. was nude from the waist down. He said he did not fondle her and he considered raping her, but mainly he just looked at her.

Zimmerman was charged with aggravated kidnapping, aggravated burglary, attempted rape, and aggravated assault. The co-worker identified Zimmerman as the assailant in a pretrial photograph lineup and at trial. A jury found him guilty on all counts.

## I. AGGRAVATED KIDNAPPING

Zimmerman advances three reasons why the evidence was insufficient to sustain his conviction of aggravated kidnapping. He claims that D.Y. was not taken by force with the intent to commit rape; that any taking was not to facilitate committing rape; and that the evidence failed to satisfy the test established in *State v. Buggs*, 219 Kan. 203, 547 P.2d 720 (1976). As the following discussion illustrates, these claims overlap.

Our standard of review is well established:

"When the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McDonald,* 250 Kan. 73, Syl. ¶ 7, 824 P.2d 941 (1992).

The trial court instructed the jury that in order to convict Zimmerman of aggravated kidnapping, the State had to prove, among other things, that Zimmerman took D.Y. by force and that it was done with the intent to hold her to facilitate committing rape. Zimmerman acknowledges there was evidence of force in that he struck D.Y. on the head with a pistol. He argues, however, that hitting D.Y. on the head with a pistol was *not* done with the intent to facilitate committing rape. Zimmerman maintains that, because D.Y. was not conscious when he hit her on the head and because she was unaware of any of the events that followed while he was in the apartment, hitting her on the head had no effect on the taking. We disagree; the issue before us is not D.Y.'s state of awareness, but Zimmerman's intent.

Zimmerman told the police he entered the apartment in order to steal a purse he saw on the kitchen counter. D.Y. testified her purse was out of sight, stashed in a duffle bag. The co-worker testified her purse was in one of the closets and not in plain view. The co-worker's boyfriend testified that although he left his wallet on the kitchen counter, it was still intact after Zimmerman left. It follows that a jury could surmise that Zimmerman's intent was not to steal.

There was evidence of Zimmerman's intent to commit rape. He told the police he was considering rape, he moved D.Y. to a secluded area, and he pulled her shorts down to the extent he said she was nude from the waist down. Hitting D.Y. over the head in conjunction with his other acts is sufficient evidence for a jury to find that Zimmerman took D.Y. by force and that he did it with the intent to commit rape.

Zimmerman also argues that if there was a taking, it did not facilitate the crime of rape. The trial court's jury instructions were based upon the kidnapping and aggravated kidnapping statutes. "Aggravated kidnapping is kidnapping, as defined in section 21-3420, when bodily harm is inflicted upon the person kidnapped."

K.S.A. 21-3421. Zimmerman does not dispute that D.Y. suffered bodily harm.

In *State v. Buggs,* 219 Kan. 203, Syl. ¶¶ 7-10, this court held.

"Our kidnapping statute, K.S.A. 21-3420, requires no particular distance of removal, nor any particular time or place of confinement. Under that statute it is the fact, not the distance, of a taking (or the fact, not the time or place, of confinement) that supplies a necessary element of kidnapping."

"Under K.S.A. 21-3420 a taking or confining is a kidnapping if its purpose is to 'facilitate' the commission of any crime, even if the crime facilitated be a less serious crime such as robbery or rape."

"The word 'facilitate' in K.S.A. 21-3420 means something more than just to make more convenient. A taking or confining, in order to be said to 'facilitate' a crime, must have some significant bearing on making the commission of the crime 'easier.' "

"If a taking or confining is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:

(a) Must not be slight, inconsequential and merely incidental to the other crime;

(b) Must not be of a kind inherent in the nature of the other crime; and

(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection."

The *Buggs* court listed examples of when a taking is done to facilitate the commission of another crime. One such example involved rape. The court stated: "The removal of a rape victim from room to room within a dwelling solely for the convenience and comfort of the rapist is not a kidnapping; a removal from a public place to a place of seclusion is." 219 Kan. at 216.

The State argues a rational factfinder could find that after Zimmerman hit D.Y. on the head, he dragged her to the laundry area in order to escape detection. The sliding glass door could be seen from one of the apartment complex parking lots. Evidence at trial indicated that individuals walking by the sliding glass door could see into the apartment and see the winged-back chair. The laundry area, however, could not be seen from the sliding glass door. A jury reasonably could conclude that Zimmerman's movement of D.Y. from the chair to the laundry area was a removal to a place of seclusion, substantially lessening his risk of detection. Thus, a jury reasonably could find that a taking occurred.

A rational factfinder could find beyond a reasonable doubt all the elements of aggravated kidnapping. Thus, the evidence is sufficient to support the conviction of aggravated kidnapping.

## II. ATTEMPTED RAPE

Zimmerman claims the evidence was insufficient to sustain his conviction of attempted rape because the State failed to prove that he performed an overt act toward committing rape. The State alleged that the overt act was Zimmerman pulling down D.Y.'s clothing. Zimmerman also claims the evidence was insufficient for a jury to find he had the intent to commit rape. Zimmerman maintains his intended offense was most likely voyeurism, which is evidenced by his statement to police that he did not touch or fondle D.Y.

The standard of review for sufficiency of the evidence is the same as set forth in the preceding issue.

In *State v. William*, 248 Kan. 389, Syl. ¶ 5, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991), this court held: "An 'attempt' at a crime is any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime."

This court has established guidelines for determining if an overt act has occurred:

"No definite rule as to what constitutes an overt act for the purposes of attempt can or should be laid down. Each case must depend largely on its particular facts and the inferences which the jury may reasonably draw therefrom." *State v. William*, 248 Kan. 389, Syl. ¶ 8.

"The determination of the existence of an overt act is a jury function. There is no definitive rule as to what constitutes an overt act; each case depends on the inferences a jury may reasonably draw from the facts. It must be shown that the defendant took a step beyond mere preparation so that some appreciable fragment of the crime was committed." *State v. Chism*, 243 Kan. 484, Syl. ¶ 3, 759 P.2d 105 (1988).

"The overt act necessarily must extend beyond mere preparations made by the accused and must approach sufficiently near to consummation of the offense to stand either as the first or subsequent step in a direct movement toward the completed offense." *State v. Gobin*, 216 Kan. 278, Syl. ¶ 3, 531 P.2d 16 (1975).

The Kansas appellate courts have interpreted broadly the overt act requirement in the context of attempted rape. In *State v.*

*Lora*, 213 Kan. 184, 192, 515 P.2d 1086 (1973), "[t]he overt act toward perpetration of the rape which was necessary to constitute the crime of attempted rape in this case consisted of seizing [the victim] and attempting to restrain her within the residence."

Here, there is substantial evidence that Zimmerman's actions went beyond mere preparation. He hit D.Y. on the head with a gun because he thought she might wake up; he dragged her back into the laundry area; and he acknowledged pulling down her clothing. A rational factfinder could find that these actions constituted the first step toward raping D.Y.

When the police questioned Zimmerman concerning his intent, he said, "I was considering rape, but mainly I just looked."

Zimmerman argues that although he may have considered rape, it does not mean he formed the intent to rape. Zimmerman iterates that he told police he entered the apartment with the intent to steal a purse. As already discussed, however, the only evidence supporting this claim was Zimmerman's statement to police. The co-worker and D.Y. testified their purses were not in sight. The co-worker's boyfriend testified his wallet was on the kitchen counter, but was not taken. Therefore, a rational factfinder could conclude beyond a reasonable doubt that Zimmerman did not have the intent to steal and that Zimmerman's own statements to the police provided a sufficient basis to conclude he had the intent to rape. The attempted rape conviction is supported by evidence from which a reasonable factfinder could find guilt beyond a reasonable doubt.

### III. SUPPRESSION OF STATEMENTS

Zimmerman filed a motion with the trial court to suppress his statements to the police, alleging the statements were taken in violation of his Fifth Amendment right to remain silent. At the suppression hearing, Zimmerman testified that his requests for an attorney and for rest were ignored. Zimmerman said the detective told him the sooner Zimmerman signed the waiver form and answered the questions, the sooner he would be done.

In *State v. Zuniga*, 237 Kan. 788, 792, 703 P.2d 805 (1985), we held:

" 'In determining the voluntariness of a confession, it is to be viewed in light of the totality of circumstances, including the following factors: (1) The

duration and manner of interrogation; (2) the accused's ability upon request to communicate with the outside world; (3) the accused's age, intellect and background; and (4) the fairness of the officers in conducting the interrogation. Essential to the inquiry is the determination that the statement was the product of the free and independent will of the accused. If the accused was not deprived of his free choice to admit, deny or refuse to answer, the statement may be considered voluntary. *State v. Prince*, 227 Kan. 137, 144, 605 P.2d 563 (1980); *State v. Watkins*, 219 Kan. 81, 97, 547 P.2d 810 (1976); *State v. Creekmore*, 208 Kan. at 934. The burden of proving the statement was voluntary rests with the State. *State v. Kanive*, 221 Kan. at 35.' "

Our standard of review is:

" 'When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given, and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence.' " 237 Kan. at 792 (quoting *State v. Brown*, 235 Kan. 688, Syl. ¶ 3, 681 P.2d 1071 [1984]).

The trial court denied Zimmerman's motion to suppress, reasoning:

"Turning to the interrogation at the station, we have two tapes, two Miranda rights waiver forms which relate to two separate interrogations, and I have listened to the tapes as well as having read the transcripts. So I have had an opportunity to listen to Mr. Zimmerman's responses and Detective Davis' questions and the tone of voice that was used by both of the participants in the conversation, and I find nothing impressive at all about the taped interviews, no duress being used. It was a low key, straight forward type of interview. From the evidence I heard the rights waiver forms were correctly obtained, Mr. Zimmerman['s] rights were explained to him.

"He testifies that, in fact, he asked for an attorney and that he was pressured into signing those forms because he was told that he wouldn't be able to leave, or at least the inference was made that he wouldn't be able to leave in a timely manner. I find no evidence of that other than Mr. Zimmerman's self-serving testimony. Detective Davis categorically denies any of those things occurred, and the taped interview in each instance certainly doesn't indicate any problems of that nature having been raised, and I am not persuaded by Mr. Zimmerman's testimony in that regard.

"With respect to whether or not the interrogation itself was of such a duration and so tiring and taxing as to have been unreasonable, it wasn't all that lengthy. Especially when one considers that there was a break between the first interview and the second interview . . . . ."

Zimmerman was arrested on July 29, 1989, as a result of a separate incident, and taken into custody around 1 a.m. He was

placed in a holding cell at the police station until Dennis Davis, a detective with the Johnson County Sheriff's Department, interviewed him. The interrogation began around 3:30 a.m. and ended approximately an hour later. Zimmerman was not restrained by handcuffs during the interrogation. Davis testified at the suppression hearing that Zimmerman said he understood his rights and he did not have any questions regarding those rights. Additionally, Zimmerman agreed to talk with the detective. Zimmerman signed and initialed the waiver form. The last 13 minutes of the interview were taped. During this interrogation, Zimmerman's involvement in the acts giving rise to this case became apparent.

Zimmerman then was returned to the holding cell. Approximately an hour later, Davis went to Zimmerman's cell and told him that he had additional incidents he would like to discuss with the defendant. Zimmerman accompanied Davis back to the same interview room. Again, Davis read Zimmerman his *Miranda* rights, and Zimmerman signed and initialed a second rights waiver form. This interview lasted about an hour and 45 minutes. The last 15 minutes of the interview again were recorded.

Davis testified at the suppression hearing that during the course of the interrogation process, Zimmerman never requested an attorney; Zimmerman never requested the questioning cease; Zimmerman never requested a break; and Zimmerman never indicated he was too tired to proceed. Davis also stated he never made any threats or promises toward Zimmerman in exchange for obtaining the statements.

At the suppression hearing, Zimmerman testified that after a 15-minute delay, he signed the first waiver form because Davis told him "the sooner [he] signed the form, the sooner [he] could be out of there." Zimmerman also stated that during the second interview he asked for an attorney and he asked to be able to rest. Zimmerman said Davis responded by telling him again "the sooner [he] signed—the sooner [he] answered the questions the sooner [he] could be done." Zimmerman claims that despite his requests, Davis continued to question him.

On cross-examination, Zimmerman admitted that during the taped part of the interrogations, he never indicated he wanted an attorney present. Zimmerman also acknowledged there had

been no pressure exerted against him to sign the form. Zimmerman agreed that he had understood the questions Davis asked him.

Zimmerman was 21 years of age at the time of the interrogation. He dropped out of high school after the tenth grade, but subsequently obtained a G.E.D. Zimmerman does not allege that he was denied the opportunity to communicate with the outside world. In fact, Zimmerman never requested contact with either of his parents, who are divorced, at any point during the interrogation process.

The trial court's finding that the statements were given freely and voluntarily is supported by substantial competent evidence; thus, the trial court did not err in refusing to suppress the statements.

Zimmerman adds a new twist to his argument on appeal. He contends that because Davis was not called back to the stand to rebut Zimmerman's testimony at the suppression hearing, the State failed to prove that Zimmerman's statements were given voluntarily. Zimmerman's argument is not persuasive. Davis already had addressed the voluntariness issue, and the fact that Davis testified first does not lessen the value or credibility of his testimony.

## IV. NEWSPAPER ARTICLE

Zimmerman's complaint is two-fold. First, he alleges the trial court erred in refusing to question the jurors concerning whether they had read a newspaper article about the defendant. Second, Zimmerman contends the trial court erred in refusing to release the addresses of the jurors to defense counsel after the completion of the trial.

At the beginning of the second day of trial, defense counsel informed the court there was an article about Zimmerman in the morning paper. In addition to discussing the trial, the article mentioned Zimmerman's prior conviction and pending charges. Defense counsel requested that the court poll the jurors to find out if any of them had read the article.

The trial judge responded that the jury previously had been admonished not to read any newspapers. The judge continued:

"THE COURT: . . . I understand your concerns. On the other hand, unless you have some cause to believe that the jury may have violated the Court's admonitions and read such an article, I am not going to engage in a fishing expedition in an effort to impeach this jury. If you wish, I will give the jury the admonition with respect to reading the media accounts again, if you want to do that. You may—that is a double-edged sword. You may simply be drawing excess attention to that admonition, but if you want it done, I will re-admonish the jury with respect to matters pertaining to coverage of the case in the media."

Defense counsel declined the offer.

At the hearing on Zimmerman's motion for new trial, defense counsel again objected to the trial judge's failure to poll the jury regarding the newspaper article. In addition, defense counsel requested the addresses of the jurors in order that she might interview them. The judge again asked if defense counsel had any reason to believe that any juror had read the article. Defense counsel admitted she had not visited with the jurors. The trial judge reminded defense counsel that she could have visited with the jurors following the trial. The judge denied defense counsel's request, concluding:

"What you are asking me to do is breach confidential information with respect to the jurors['] addresses and so on, how they can be reached, for a fishing expedition to find out whether or not you have some basis for the jury to impeach its own verdict, and I am a little concerned about taking that approach on the matter. I would have absolutely no reluctance whatsoever to grant your request if you were coming into the courtroom with an indication that someone had overheard a conversation among jurors or someone had seen a jury reading a newspaper article that you are talking about or even reading that particular edition of the newspaper that morning."

In *State v. Smith*, 215 Kan. 34, 35, 523 P.2d 691 (1974), this court denied a similar request from defense counsel to poll the jury. We held:

"A motion to inquire during trial is not a proper method to determine if members of a jury are aware of prejudicial articles published by a newspaper during the trial. [Citation omitted.]

"Where the record on appeal, as here, fails to show that a single member of the jury was made aware of the publicity, when it does not appear the publicity was massive, pervasive or disruptive of the trial proceedings no trial error appears for there is no showing that defendant was deprived of a fair trial. [Citation omitted.]"

Additionally, this court has held that even if a juror reads a newspaper article, it is not automatic grounds for reversal, new trial, or mistrial. See *State v. Pioletti*, 246 Kan. 49, 65, 785 P.2d 963 (1990).

Here, the publicity was *not* massive, pervasive, or disruptive of the trial proceedings. It was a small article in Section B of The Kansas City Star. The trial court did not err in refusing to poll the jury.

Zimmerman also claims the trial court erred in refusing to release the addresses of the jurors. The trial court reasoned it would be a breach of confidentiality to release the information. In support of his claim, Zimmerman cites *In re Globe Newspaper Co.*, 920 F.2d 88 (1st Cir. 1990), in which the First Circuit held that releasing names and addresses was not a breach of confidentiality. In *Globe*, it was a newspaper requesting the names and addresses of the jurors after the completion of the trial. Here, defense counsel requested the information. These are different issues with separate concerns. Therefore, the *Globe* case is not applicable.

Instructive is *State v. Blocker*, 211 Kan. 185, 505 P.2d 1099 (1973), in which this court addressed similar concerns. In *Blocker*, the defendant moved for a new trial. Four jurors were summoned for the "ostensible purpose" of determining what occurred during deliberations. The State protested that defense counsel was on a fishing expedition for error, and the trial court agreed. When asked if he wanted to make a proffer, defense counsel "responded that the jurors would generally describe matters they considered in arriving at their verdict, some of them *perhaps* being matters outside the scope of the evidence." 211 Kan. at 196. This court affirmed the trial court, reasoning:

"We have long adhered to the rule that a juror may not impeach his verdict on a ground inhering in the verdict itself: he may not divulge what considerations influenced him in arriving at his verdict or the reasoning on which he based his decision.

. . . .

"On the other hand, evidence as to extraneous matters such as misconduct or physical facts or occurrences, either within or without the courtroom, is admissible if material to the issues being determined. [Citations omitted.] This rule, however, is not intended to authorize broad hunting expeditions or fishing excursions. Some semblance of materiality must be made to ap-

pear. Here, the proffer made by the defendant was iffy at best, being prefaced by the adverb perhaps. Indeed it was conceded that counsel had not even attempted to interview or visit with members of the jury. Defense counsel had no idea whether cause existed for questioning the verdict." 211 Kan. at 196-97.

Here, as in *Blocker*, defense counsel fails to offer any "semblance of materiality" and has no idea if cause existed for questioning the verdict. Defense counsel also failed to take advantage of the opportunity to interview or visit with members of the jury in the jury room after the verdict was returned when invited to do so by the trial judge.

In *State v. Stewart*, 219 Kan. 523, 530, 548 P.2d 787 (1976), *overruled on other grounds State v. Fortune*, 236 Kan. 248, 689 P.2d 1196 (1984), this court discussed ways defense counsel can prove jurors are aware of a prejudicial newspaper article:

"In order to prove that members of the jury were aware of the newspaper article, counsel for the defendant could have requested a poll of the jury after it returned its verdict. In the alternative he could have subpoenaed the jurors on motion for a new trial to show that they had knowledge of the article."

Here, defense counsel did not follow either procedure.

A motion for new trial, pursuant to K.S.A. 60-259(c), requires that the alleged errors or grounds relied upon to support a new trial be stated specifically. "Evidence must be produced whenever the motion is grounded upon 'exclusion of evidence, want of fair opportunity to produce evidence, or newly discovered evidence.' K.S.A. 60-259(g). Where counsel makes no showing to support allegations of juror misconduct, the trial court does not abuse its discretion in refusing to call jurors." *State v. Ruebke*, 240 Kan. 493, 513, 731 P.2d 842, *cert. denied* 483 U.S. 1024 (1987).

The trial court can, if justified, keep the jurors' names and addresses confidential. The facts before us do not warrant that action, and the trial court erred in stating that releasing the jurors' addresses would be a breach of confidential information. However, "[t]he judgment of a trial court, if correct, is to be upheld, even though the court may have relied upon a wrong ground or assigned an erroneous reason for its decision." *State v. Wilburn*, 249 Kan. 678, Syl. ¶ 5, 822 P.2d 609 (1991). Therefore, even if the release of information was not a breach of confidential infor-

mation, the trial court did not err based on the record before us. Here, defense counsel could have polled the jury at the conclusion of the trial and did not request permission to do so. Counsel then had an opportunity to personally visit with the jurors and was invited by the judge to do so. Defense counsel had the names, addresses, occupations, and marital statuses of the jurors prior to and during jury selection and, although this information was returned to the jury coordinator, counsel should have had a seating chart with the jurors' names.

In *United States v. Sangetti*, 446 F.2d 552 (9th Cir. 1971), the Ninth Circuit considered the same argument, *i.e.*, it was reversible error for the trial judge to deny counsel's request for the addresses and telephone numbers of the jurors so defense counsel could interview the jurors after the verdict. The Ninth Circuit handled that argument in one sentence, stating, "He was not entitled to any such 'room service.' "

Here, defense counsel had a telephone book and city directory available, through the public library, and made no effort to locate any of the jurors to learn whether any juror had violated the court's instructions and read the newspaper article. The defendant has not demonstrated error on this issue.

Affirmed.