No. 67,291

STATE OF KANSAS, *Appellee,* v. RANDY SNODGRASS, *Appellant.*

(843 P.2d 720)

Opinion filed December 14, 1992.

*B. Kay Huff*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Frank D. Diehl*, assistant district attorney, argued the cause, and *Christine E. Kenny*, assistant district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

HOLMES, C.J.: Randy E. Snodgrass appeals from his convictions by a jury of aggravated kidnapping (K.S.A. 21-3421), rape (K.S.A. 21-3502), aggravated sodomy (K.S.A. 21-3506), and aggravated assault (K.S.A. 21-3410). The issues on appeal involve the admission in evidence of the defendant's statement to police and the denial by the trial court of a request for a continuance so that the defendant could obtain DNA testing. We affirm.

On November 1, 1990, at approximately 11:50 a.m., T.H. left her parents' home in Lawrence to attend an employee luncheon banquet. She placed her two-week-old daughter in her car and, while preparing to get in the driver's side, heard Randy E. Snodgrass call her name. She recognized him as the son of a woman who lived across the street from her parents. Snodgrass told T.H. that his mother had fallen in the house and asked for her help. T.H. hesitated but then followed Snodgrass into the house. When she realized that Snodgrass' mother was not in the house, T.H. attempted to leave but was knocked to the floor and attacked. T.H. testified that Snodgrass jumped on top of her, pulled a knife from his back pocket, and held it against her throat. He forced her into a bedroom, ripped off her clothing, forced her to perform oral sex, and raped her. He also struck her several times. Upon allowing T.H. to leave he threatened to kill her family if she told anyone what had happened.

Later that day, T.H. reported the incident to her gynecologist, who sent her to Lawrence Memorial Hospital. At the hospital, a sexual assault collection kit was performed, and a police officer questioned T.H. about the incident. During the questioning,

T.H. named and described her attacker and gave the officer the address of the defendant's parents' house where the incident occurred.

At 9:00 a.m. on November 2, 1990, Detectives David Davis and David Reavis proceeded to the address given by T.H. and at approximately 9:50 a.m. found the defendant hiding in a crawl space under the house. As the defendant emerged from the crawl space, Detective Davis drew his gun and pointed it at Snodgrass. Detective Davis testified that, based on the initial report of the assault and rape, he had reason to believe the defendant was possibly dangerous and armed with a knife. Detective Davis then placed Snodgrass under arrest and took him to the Law Enforcement Center (LEC) for interrogation. At 10:10 a.m. Snodgrass was advised of his *Miranda* rights. Snodgrass stated he understood his rights and agreed to waive them. He was then questioned about the alleged crimes. Additional facts will be set forth as required for consideration of the issues raised on appeal.

In his first issue, the defendant asserts that the trial court erred in not suppressing the defendant's statement given to the Lawrence police. In that statement defendant admitted he had forcibly raped and sodomized T.H.

Prior to trial, defense counsel filed a motion to suppress defendant's confession on the grounds that the confession was not the product of defendant's free and uncoerced will. Additionally, defense counsel maintained that the defendant was under the influence of alcohol and/or drugs and thus incapable of making a free and voluntary decision to waive his constitutional right to remain silent. Defense counsel also maintained defendant's mental state rendered him unable to freely and voluntarily waive his constitutional rights.

On January 2, 1991, the trial court held a *Jackson v. Denno* suppression hearing to determine whether the defendant's confession was made voluntarily. The trial court, after reviewing all the evidence presented, found defendant's statements were voluntarily made after being advised of his rights, understanding his rights, and waiving his rights. At the suppression hearing Detective Davis testified on behalf of the State, while the defendant presented testimony from Detective Reavis, Dallas Murphy, and the defendant.

Detective Davis testified that when Snodgrass emerged from the crawl space, his voice was clear and distinct. Thereafter, the defendant seemed somewhat shaky and was assisted by the detectives in walking to the police car after the arrest and in walking into the LEC. After his arrival at the LEC, the defendant began talking in soft tones, but answered questions in a thoughtful manner, usually taking a considerable length of time before answering. Detective Davis testified that the defendant did not appear to be under the influence of alcohol or drugs, his speech was clear and coherent throughout the majority of the interview, he responded to questions thoughtfully, and he had no problems responding to specific questions; Detective Davis testified he had no problems understanding the defendant's answers. Davis further testified that upon arrival at the LEC, the defendant was advised of his *Miranda* rights at 10:10 a.m., which was prior to any interrogation about the alleged crimes. After being read the *Miranda* rights the defendant responded in the affirmative when asked if he understood his rights and if he was willing to waive them and talk to the detectives. The defendant never asked for an attorney and at no time invoked his right to remain silent. During the interview the defendant asked for cigarettes and, after receiving a Coca-Cola and cigarettes, he confessed to the assault, sodomy, and rape. The interview concluded at 12:20 p.m., having lasted less than two and one-half hours.

On cross-examination, Detective Davis testified that he had no prior knowledge that the defendant may have suffered any mental problems, that he did not inquire from the defendant about any prior psychological treatment or hospitalization he may have had, and that he was not aware that defendant had spent 9 or 10 years at Larned State Security Hospital. Detective Davis did not conclude that the defendant was suffering from a mental illness.

The defense called Detective Reavis, one of the arresting and interrogating officers, as a witness. Reavis testified that when the officers first came into contact with the defendant he was shaking and needed help to get into the LEC and that he was nervous and somewhat incoherent but calmed down and was coherent during most of the interview. Reavis further testified no inquiry was made during the interview about the mental history or condition of the defendant and that Reavis had no knowledge of any

mental illness suffered by the defendant or other members of defendant's family. On cross-examination, Reavis testified the defendant had settled down at the time he was advised of his constitutional rights, that defendant seemed to understand his rights and the questions propounded to him and that he gave logical, rational responses to the questions. Reavis testified he saw no indication that the defendant might be intoxicated or under the influence of drugs or alcohol. He further testified the defendant was not threatened or coerced in any way and that no promises were made to the defendant.

Dallas Murphy, the Douglas County jail administrator for the sheriff's office, was also called as a witness for the defendant. He testified he saw the defendant twice on November 2, 1990, at the LEC and the jail. The first time, the defendant was being escorted down the hall by Detective Davis and another officer. The officers had the defendant by the arms and the defendant was walking in a bent over, shuffling manner. Later, at about 3:00 p.m., Murphy observed the defendant when he was booked into the jail by another officer. Defendant was still shuffling along, appeared to be depressed, and mumbled when he spoke. On cross-examination, Murphy testified his encounters with the defendant were brief, he was not present during the interrogation of the defendant, he did not book the defendant into the jail, and he had not engaged the defendant in extended conversation.

The defendant testified in his own behalf and stated he remembered very little about the arrest or the proceedings that took place at the LEC. He did testify that when he left New Mexico on October 31, he drank some whiskey and while hitchhiking to Oklahoma City on his way to Lawrence he was given some pills, probably speed, by a driver who picked him up. He then testified at some length about his history of mental illness, his treatment in various hospitals, and his drug and alcohol abuse. On cross-examination, he admitted he had not been threatened by the officers and that no promises were made to him.

Following argument by counsel, the trial court found that the statement given by the defendant was "voluntarily made after being advised of his rights, understanding his rights, and waiving his rights, and agreeing to visit with the interrogator." The motion to suppress the defendant's statement was denied and at trial

Detective Davis testified at length about the contents of the statements made by the defendant.

At the outset we note that the defendant did not seriously assert in oral argument before this court, or in his brief, that he was under the influence of alcohol or drugs at the time his statement was taken by the Lawrence police. A review of the record reveals no substantial or credible evidence of any such impairment, and we deem that argument to have been abandoned.

Defendant's initial argument is twofold. First, the defendant argues that his confession was not voluntary but instead was the result of "an inherently coercive situation acting upon his mental illness." Specifically, defendant contends the police intimidated him during the arrest and interrogation and coerced his confession, in violation of the Due Process Clause of the Fourteenth Amendment. Second, defendant claims that he did not knowingly and intelligently waive his *Miranda* rights and that the trial court erred in failing to make a specific finding of a knowing and intelligent waiver.

The standard of review in determining whether a defendant's statement was freely, voluntarily, and knowingly given was recently set forth in *State v. Clemons*, 251 Kan. 473, Syl. ¶ 2, 836 P.2d 1147 (1992), where we stated:

"When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused; determines the statement was freely, voluntarily, and knowingly given; and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. *State v. Zuniga*, 237 Kan. 788, Syl. ¶ 3, 703 P.2d 805 (1985)."

Defendant, in a rambling brief that deals rather loosely with the facts, appears to contend that his arrest at gunpoint coupled with his mental problems resulted in his statement being coerced and involuntary. We find nothing unwarranted or coercive, in the legal sense, about defendant's arrest at gunpoint. Detectives Davis and Reavis had information, prior to the apprehension and arrest of defendant, that he might be armed with a large knife and was potentially dangerous. The officers were following proper precautionary procedures in initially arresting defendant at gunpoint. As soon as the defendant emerged from the crawl space and was handcuffed, the weapons were returned to their holsters

and not used again. Additionally, there is absolutely no evidence of any coercion prior to and during the interrogation at the LEC.

Both the defendant and the State agree that coercive police or State activity is a necessary predicate to a finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment. Both cite *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), for this proposition. In *Colorado v. Connelly*, Connelly approached a police officer and confessed to a murder. The police officer advised Connelly of his *Miranda* rights, which Connelly stated he understood. At the police station, Connelly gave a detailed description of the murder and took two officers to the location of the crime. The next day, however, Connelly became disoriented and stated for the first time that "voices" had told him to come to Denver to confess to a murder. A psychiatrist examining Connelly concluded that Connelly, in confessing to the murder, was following what he believed to be the voice of God. The psychiatrist testified that, in his expert opinion, Connelly's confession was not voluntary because Connelly was suffering from "command hallucinations" that interfered with his "volitional abilities; that is, his ability to make free and rational choices." 479 U.S. at 161.

The Colorado trial court suppressed Connelly's statements to the police on the basis that they were an involuntary confession. The Colorado Supreme Court affirmed. The United States Supreme Court held, however, that the Fifth and Fourteenth amendments did not require the suppression of Connelly's statements. The Supreme Court reasoned that nothing in the record of Connelly's case gave any indication that the confession was extracted as the result of police coercion or overreaching. 479 U.S. at 165. Without some showing of police overreaching, the due process clause did not require the exclusion of Connelly's confession, because "[a]bsent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law." 479 U.S. at 164.

The Court then went on to state:

"Respondent correctly notes that as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the 'voluntariness' cal-

culus. [Citation omitted.] But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.' " 479 U.S. at 164.

The United States Supreme Court explained:

"[S]uppressing respondent's statements would serve absolutely no purpose in enforcing constitutional guarantees. The purpose of excluding evidence seized in violation of the Constitution is to substantially deter future violations of the Constitution. [Citation omitted.] Only if we were to establish a brand new constitutional right—the right of a criminal defendant to confess to his crime only when totally rational and properly motivated—could respondent's present claim be sustained." 479 U.S. at 166.

In *State v. William,* 248 Kan. 389, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991), this court reviewed at length the standard and factors to be considered in determining whether a confession or statement is voluntary. In *William,* the defendant was convicted of first-degree murder in connection with the death of a nine-year-old boy. The facts are set forth in great detail in the opinion and need not be repeated here. Suffice it to say William contended that his mental condition, in combination with the facts surrounding his interrogation, rendered his confession involuntary.

This court in *William* stated the following precepts of law:

"A confession must be voluntary to be admissible. A person's mental capacity is relevant in determining whether a confession was voluntary. *Culombe v. Connecticut,* 367 U.S. 568, 602-03, 6 L. Ed. 2d 1037, 81 S.Ct. 1860 (1961). In determining whether a confession is voluntary, a court is to look at the totality of circumstances. *Fikes v. Alabama,* 352 U.S. 191, 197, 1 L. Ed. 2d 246, 77 S. Ct. 282, *reh. denied* 352 U.S. 1019 (1957). This court follows that standard. See *State v. Waugh,* 238 Kan. 537, 541, 712 P.2d 1243 (1986)." 248 Kan. at 406.

*William* cited *Colorado v. Connelly* for the propositions that a defendant's mental condition is only one factor used in the determination of voluntariness, and, that for the confession to be a violation of the Due Process Clause of the Fourteenth Amendment, the confession must be linked to some coercive activity of the State. 248 Kan. at 408. There is nothing in the evidence in the record now before us which would indicate any coercion by the Lawrence police.

*State v. Price,* 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990), enumerates several factors which a court may consider in determining whether, under the totality of the circumstances, a confession is voluntary:

"Factors bearing on the voluntariness of a statement by an accused include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry in determining the voluntariness of a statement is whether the statement was the product of the free and independent will of the accused. Following *State v. Prince,* 227 Kan. 137, Syl. ¶ 4, 605 P.2d 563 (1980)."

These factors were applied by this court in *William,* and have recently been recognized in *State v. Clemons,* 251 Kan. 473, Syl. ¶ 1.

Under the *William* and *Prince* factors, the question to be determined is whether, under the totality of the circumstances, there was substantial competent evidence to support the trial court's finding that the defendant's confession and statement were voluntary. We have already determined that there was no coercion by the police officers either at the time of arrest or during the interrogation that would render the statement constitutionally inadmissible. As previously stated, the interrogation lasted less than two and one-half hours. The record reflects that the defendant was 29 years old; had the equivalent of a high school diploma; and, despite his mental problems, clearly understood and answered the questions propounded to him. The defendant made no request to "communicate with the outside world" and there is no indication such a request would have been denied. When requested, the defendant was furnished cigarettes and a soft drink. When the *Prince* factors are applied to the facts of this case, there is no indication that the defendant's confession was anything other than voluntary.

In Kansas we have recognized that a statement may be involuntary, and thus inadmissible, even without State coercion if the defendant is found to be insane under the *M'Naghten* test. See *State v. Boan,* 235 Kan. 800, 804, 686 P.2d 160 (1984). While the defendant does claim that he suffered mental illness, which is borne out by his lengthy history and hospitalizations, he makes

no claim that he was insane under the *M'Naughten* test of insanity at the time of his confession. In fact, after being examined by one or more experts, he abandoned his claim of insanity as a defense prior to trial.

At the close of the suppression hearing, the trial court stated:

"The evidence that we have here really, even from the testimony of the defendant, does not indicate to me anyway that his statements were not voluntary. The substance of his statements here today under oath were basically that he doesn't remember a lot that occurred during that hearing or during that period of time when he was first arrested. It is true that at one time after his arrest, he was acting somewhat incoherent by the testimony of at least one officer . . . but regardless of his particular physical actions, both in the courtroom and as indicated by the testimony, the testimony is fairly clear that he was given his rights and he was given those rights after he had been given a Coca-Cola to drink and after he had been given cigarettes, which apparently he had requested, and he seemed to calm down, and then his rights were read to him and he seemed to be coherent.

"From all the evidence presented, the Court finds that his statements were voluntarily made after being advised of his rights, and waiving his rights and agreeing to visit with the interrogator. Therefore, his Motion to Suppress is denied."

In his ruling at the end of the suppression hearing, the trial judge erroneously stated that defendant had been given his *Miranda* rights "after he had been given a Coca-Cola to drink and after he had been given cigarettes." From the record it is clear that the defendant was actually advised of his constitutional rights at the start of the interrogation rather than later on. The defendant seizes upon this factual misstatement to assert that the court's decision implies the defendant was not calm and coherent at the time of the *Miranda* warnings and prior to receiving the Coke and cigarettes and, therefore, the court committed plain error requiring reversal. We do not find the evidence supports such a conclusion. When the totality of the circumstances is considered, there is abundant substantial evidence supporting the trial court's finding. The statement of the defendant was voluntarily, knowingly, and intelligently given, and the finding that the defendant waived his constitutional rights is supported by substantial competent evidence. We have considered all of the convoluted arguments of the defendant on the issue of the admission of the defendant's statement and find them to be without merit.

Defendant next argues that the trial court abused its discretion in not granting the defendant a continuance so as to allow the defendant time to obtain DNA testing.

On March 25, 1991, the trial court held a hearing wherein defense counsel requested, for the first time, that the trial court grant a continuance and allow the defendant to pursue DNA testing of certain samples of body fluids collected during the rape investigation. This request was made two days before the jury trial was scheduled to begin. Defense counsel's explanation for the delayed request was that he had only become aware one week earlier of a hospital lab report, which showed the presence of semen in the victim's vaginal fluids. Defendant argued that because the KBI test results were inconclusive, the defendant needed the DNA testing performed to exclude him as a possible donor. He further argued that the DNA results were necessary to impeach the credibility of the victim. The defendant maintained that he did not have sex with the victim, that the victim had previously testified that at the time of the attack she had not had sexual relations since the birth of her child only two weeks earlier, and that the test results might have a bearing on the victim's credibility as a witness.

On March 26, 1991, both sides made additional arguments to the trial court regarding the need for DNA testing. The trial court noted that the request for DNA testing could have been raised much earlier because the defendant knew of the existence of the rape kit evidence. The trial court also was concerned about a number of uncertainties, including who would pay for the test and whether there was anything that could be examined. Finally, the trial court was concerned with the fact that the case had been continued previously to obtain tests pursuant to defendant's insanity defense and with the fact that defendant was requesting the continuance only two days before trial. Earlier, the case had been scheduled for trial on February 27, 1991. The day before that trial date, the defendant sought and obtained a continuance for the purpose of obtaining an additional examination regarding his insanity defense. The insanity defense was subsequently abandoned.

Defendant claims that the trial court erred in failing to grant a continuance. *State v. McDonald*, 250 Kan. 73, 80, 824 P.2d 941 (1992), states:

"K.S.A. 22-3401 provides in part: 'Continuances may be granted to either party for good cause shown.' In a criminal case, the granting or denial of a continuance rests in the sound discretion of the trial court. The ruling of the trial court will not be disturbed on appeal absent a showing of an abuse of discretion and a showing of prejudice to the substantial rights of the defendant. *State v. Dunn*, 243 Kan. 414, 427, 758 P.2d 718 (1988). Discretion is abused only where no reasonable person would take the view adopted by the trial court. *State v. Haislip*, 237 Kan. 461, 471, 701 P.2d 909 (1985)."

It should be noted that the only ground upon which defendant requested the continuance was to allow for DNA testing. Defense counsel had ample opportunity to request DNA testing long prior to two days before trial. Defense counsel's decision to wait to request any testing until after receiving the results of the State's KBI lab results was defense counsel's own doing. Defendant cannot complain of the consequences of his own actions or inactions.

The trial court had already granted one continuance requested by defendant on the eve of trial. Under the circumstances of this case, it cannot be said that no reasonable person would take the view adopted by the trial judge here. The trial court did not abuse its discretion in refusing to grant the continuance.

Defendant also argues that the trial court abused its discretion in not ordering a DNA test. He contends that the trial court's refusal to order the DNA testing and to provide funds for such testing interfered with his Fourteenth Amendment right to a fair opportunity to present a defense.

K.S.A. 22-4508 provides, in relevant part:

"An attorney other than a public defender who acts as counsel for a defendant who is financially unable to obtain investigative, expert or other services necessary to an adequate defense in the defendant's case may request them in an *ex parte* application addressed to the district court where the action is pending. Upon finding, after appropriate inquiry in the *ex parte* proceeding, that the services are necessary and that the defendant is financially unable to obtain them, the district court shall authorize counsel to obtain the services on behalf of the defendant. . . . [T]he district court shall determine reasonable compensation for the services and approve payment . . . . "

*State v. Haislip*, 237 Kan. 461, 484, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985), sets forth the appropriate standard of review:

"In this state, the granting or denial of a motion to provide funds for investigative services to counsel for an indigent defendant in a criminal prosecution is a matter which rests within the sound discretion of the trial court. K.S.A. 1984 Supp. 22-4508; *State v. Frames*, 213 Kan. 113, 515 P.2d 751 (1973). The trial court's ruling will not be disturbed in the absence of a showing that the exercise of its power of discretion has been abused to the extent that a defendant's substantial rights have been prejudiced."

See *State v. Reynolds*, 230 Kan. 532, 534-35, 639 P.2d 461 (1982).

Defendant relies upon *State v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991), where this court considered the question whether DNA profiling evidence met the test for admissibility of a new scientific principle as enunciated in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). In holding that DNA evidence has gained general acceptance in the scientific community and involves scientifically established techniques so as to meet the criteria for admissibility under the *Frye* standard, 248 Kan. 238, the court did not speak to whether a criminal defendant is entitled to have the testing performed. *Deppish* simply did not deal with the question of a suspect's right to obtain last-minute scientific testing at the State's cost. Indeed, neither this court nor the United States Supreme Court has held that a criminal defendant has an unqualified right to DNA testing.

By defense counsel's own statements, it appears that DNA testing would have required a minimum of four to eight months and could possibly take as much as one to two years. When it is considered that defendant's confession was properly admissible, it appears defendant's request was nothing more than a delaying tactic and fishing expedition. No prejudice to the defendant has been shown, nor has an abuse of discretion been shown on this issue.

We have carefully considered the entire record in light of the issues and arguments propounded by the defendant and find them to be without merit.

The judgment is affirmed.