No. 75,537

STATE OF KANSAS, *Appellee*, v. MANUEL SALCIDO-CORRAL, *Appellant.*

(940 P.2d 11)

Opinion filed May 30, 1997.

*Charles A. O'Hara*, of O'Hara, O'Hara & Tousley, of Wichita, argued the cause and was on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Manuel Salcido-Corral, from his convictions of first-degree felony murder, aggravated criminal sodomy, aggravated indecent liberties with a child, and attempted aggravated indecent liberties with a child.

The defendant appeals, contending the evidence is insufficient to support a conviction for felony murder; that his statement and

consent to search were involuntary because they were obtained using the English language even though the defendant's primary language is Spanish. The defendant also alleges the trial court erred in imposing upward durational departure sentences on the three sex crimes.

At the time of the crime, the defendant had been living with Arline and her three children, R.R., age 5, Y.R., age 7, and L.R., age 12.

L.R. was found dead in her bedroom by Arline and Y.R. Arline did not testify at the trial. Y.R. testified that she found L.R. lying on her bedroom floor with her panties pulled down to her knees, with her legs apart, and with her nightgown and bra pulled up, exposing her breasts. Y.R. testified that her mother pulled up L.R.'s panties and rearranged L.R.'s nightgown to cover up L.R.'s body before the police arrived.

The coroner testified that the cause of L.R.'s death was asphyxiation. L.R. had bruises and scratches on her face which, the coroner testified, indicated that a hand was held over L.R.'s nose and mouth, causing the asphyxiation. The coroner characterized the injuries to L.R.'s face as consistent with injuries that occur during a struggle. The coroner found brown areas around L.R.'s vagina that concerned her. However, the coroner was not sure that the brown areas were specific injuries. She could neither confirm nor deny that a sexual assault occurred. No seminal fluid was found on L.R.'s body. L.R. also had several abrasions on her leg, right arm, left shoulder, face, and nose. The coroner noted that a fingernail could have caused some of the abrasions on L.R.'s body and that the bruise on L.R.'s shoulder was consistent with an injury occurring when a person is forced down on an object. A few spots of blood were found on L.R.'s halter top and slip and on her foot. The State conducted DNA tests on the blood.

From the DNA tests, testimony was given that the spots of blood on the halter top and slip came from two blood sources, while the blood on L.R.'s foot came from only one blood source. The blood spots on the halter top and slip were consistent with a combination of the defendant's blood and L.R.'s blood. After several different tests, neither L.R.'s blood nor the defendant's blood could be ex-

cluded as the source of the blood spots on L.R.'s halter top and slip. The defendant's blood could be excluded as the source of the blood on L.R.'s foot. L.R.'s blood could not be excluded as the source of this blood spot.

Y.R., who was 7 years old when the crimes occurred and 9 years old at the time of trial, testified at trial that the defendant had sexually assaulted her. According to Y.R., approximately 1 month prior to L.R.'s murder, on Valentine's Day, Y.R. had been lying on the couch watching television when the defendant laid down beside her, pulled down her pants, and attempted to touch her vagina. At this time, Y.R.'s mother called for her from Y.R.'s bedroom and Y.R. ran away from the defendant. Y.R. did not tell anyone about this incident until several months after her sister died.

Y.R. also testified that 1 month later, on the night of her sister's death, the defendant sexually assaulted her again. Y.R. stated that she had been sleeping alone in her mother's bed when the defendant entered the room. According to Y.R., the defendant put his hand over Y.R.'s mouth so she could not yell and held her so she could not run away. Then, the defendant partially put his penis in her rectum. The defendant also rubbed Y.R.'s vagina under her clothes. Y.R. eventually got away from the defendant, and she went to sleep with her mother on the couch in the living room. Then, Y.R. testified, the defendant left through the front door. The three incidents described above concerning Y.R. formed the basis for the aggravated sodomy and two indecent liberties with a child convictions.

After L.R.'s body was discovered, the police were contacted. Y.R. testified she saw the defendant drive by the house while the police were investigating the crime scene. The defendant left the Wichita area and went to Mexico and Texas to visit his family. The police who investigated the crime scene wanted to talk to the defendant. They eventually found him 1 month later at his sister's house in Arlington, Texas. A detective from the Wichita Police Department interviewed the defendant in Texas.

During the interview, the defendant admitted that he had been living with Arline several days a week during the time that the crime occurred. On the night L.R. was killed, the defendant stated

he had worked on Arline's car until 11:30 p.m. He then went to a nearby club. The defendant explained that when he left the club at 2 a.m., he got into a fight with a man who owed him money. During this fight, the defendant claimed he sustained a bleeding cut on his finger when he knocked out the other combatant's front teeth.

Then, according to the defendant, he went back to Arline's house. The defendant said that he looked in on Y.R. who was in bed in Arline's room. He talked to Y.R., told her he was leaving, and left the room. The defendant also told the detective that he looked into L.R.'s room but did not go in. The defendant said he checked in L.R.'s room because she had a habit of sneaking out of the house at night and he wanted to make sure she was still home. According to the defendant, L.R. called him an "asshole" in Spanish when he checked her room. At that time, the defendant said he left Arline's house and went to his wife's house to pick up some clothes. He then left to go on to Texas and then Mexico in order to meet his family there for a vacation as he had planned to do.

The defendant told the detective that he later found out L.R. was dead, but he did not contact Arline because he did not have a telephone and he was too lazy to write. At the end of the interview, the defendant made two spontaneous statements: "After you get the results of the test, I'll tell you what happened," and "What do you think of people that kill their kids?" The defendant would not elaborate on these statements. At trial, the defendant said he made these statements because he thought the tests would show that Arline killed L.R.

The State charged the defendant with alternative counts of premeditated murder and felony murder of L.R. The court instructed the jury that if it did not find the defendant guilty of first-degree premeditated murder, then it should consider the alternative charge of first-degree felony murder. The underlying crimes for the felony murder charge were aggravated criminal sodomy or rape of L.R. (or attempts at these crimes). The State did not charge those crimes as separate counts.

The defendant took the stand and denied committing the crimes. Nevertheless, the jury found the defendant guilty of felony murder

of L.R. and guilty of the three sex crimes against Y.R. The trial court imposed an upward durational departure for the three crimes committed against Y.R., and ran the four sentences consecutively, sentencing the defendant to life plus 362 months.

## I. SUFFICIENCY OF THE EVIDENCE

"If the sufficiency of evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Timley*, 255 Kan. 286, Syl. ¶ 13, 875 P.2d 242 (1994).

The defendant argues the evidence was insufficient to convict him of felony murder. The State charged the defendant with felony murder based on the underlying felonies of aggravated criminal sodomy or rape against L.R. or attempts to commit those crimes. In the felony-murder instruction, the court provided the elements of rape and aggravated criminal sodomy. According to the defendant, there is no evidence whatsoever that he committed aggravated sodomy or rape against L.R.

Looking at this evidence in the light most favorable to the prosecution, the defendant admits that the evidence might support his involvement in the killing of L.R. However, the defendant claims that this evidence does not support the fact that he attempted to commit or did in fact commit aggravated criminal sodomy or rape against L.R. According to the defendant, the only evidence which supports the fact he committed or attempted to commit aggravated sodomy or rape against L.R. is as follows:

1. Some of L.R.'s family members found L.R. dead with her panties pulled down to her knees and her breasts exposed.

2. Y.R. had been sexually assaulted on the same night.

3. The defendant's blood was on L.R.'s clothing.

The defendant asserts that such evidence is insufficient to support a finding that he committed or attempted to commit aggravated sodomy or rape against L.R. The defendant concedes that this evidence might support a finding that he committed the crime of indecent liberties against L.R. However, this crime was not charged as an underlying felony of the felony-murder charge.

Rather, the State based its felony-murder charge on the underlying felonies of aggravated criminal sodomy or rape, or an attempt to commit these crimes. Thus, the defendant claims that the evidence is insufficient to support his felony-murder conviction and that this conviction should be overturned.

An attempt is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a). There is " '[n]o definite rule as to what constitutes an overt act for the purposes of attempt . . . . Each case must depend largely on its particular facts and the inferences which the jury may reasonably draw therefrom.' " *State v. William*, 248 Kan. 389, 404, 807 P.2d 1292, *cert. denied* 502 U.S. 837 (1991) (quoting *State v. Garner*, 237 Kan. 227, Syl. ¶ 3, 699 P.2d 468 [1985]).

In order to prove the defendant attempted an underlying felony (and thereby committed felony murder), the State must show that the defendant took a step beyond mere preparation so that some appreciable fragment of the underlying crime was committed. *State v. Chism*, 243 Kan. 484, 490, 759 P.2d 468 (1988). The overt act requirement in the context of attempted rape and attempted aggravated criminal sodomy has been interpreted broadly. Further, in regard to the intent element of attempted rape or attempted aggravated criminal sodomy, "intent . . . may be shown by acts, circumstances, and inferences reasonably deductible therefrom." *William*, 248 Kan. at 402.

The amount and type of evidence sufficient to support a finding that a defendant attempted to commit rape or aggravated criminal sodomy has been before this court before in *State v. Zimmerman*, 251 Kan. 54, 60-61, 833 P.2d 925 (1992); *William*, 248 Kan. at 402-03; *State v. Arnold*, 223 Kan. 715, 576 P.2d 651 (1978) (the facts in *Arnold* were set out in the Court of Appeals opinion, 1 Kan. App. 2d 642, 573 P.2d 1087 [1977]; the Supreme Court relied on those statements of fact, but reversed the Court of Appeals on the sole issue of whether a battery instruction was required as a lesser included offense of attempted rape); and *State v. Lora*, 213 Kan. 184, 191-92, 515 P.2d 1086 (1973).

In *Lora*, the overt act toward the perpetration of the rape necessary to constitute the crime of attempted rape consisted of seizing the victim and attempting to keep her in the residence. 213 Kan. at 192. In *Zimmerman*, the defendant entered an unlocked apartment with the alleged intent to steal a purse that he saw from outside through a window. However, the victim testified that a purse was not visible from the outside. The defendant hit the victim over the head with a gun, dragged her to a secluded place in the apartment, and pulled down the victim's shorts. The defendant told the police that he considered raping the victim, "but mainly I just looked." The defendant claimed he did not fondle the victim. The victim had no memory of the incident. This court held that a rational factfinder could find beyond a reasonable doubt that the defendant performed an overt act toward committing a rape and had the intent to commit a rape. Thus, this court found the defendant's conviction for attempted rape was supported by sufficient evidence. 251 Kan. at 60-61.

In *William*, the defendant was convicted of felony murder and he appealed, contending that the evidence was insufficient to prove the underlying felony of attempted aggravated criminal sodomy. According to the defendant, the only evidence of a sexual assault on the victim was the defendant's confession that he attempted to have sex with the victim after the victim was dead. The question was whether the defendant committed an overt act toward the perpetration of aggravated sodomy while the victim was still alive or while the defendant thought the victim was still alive. At trial, a police officer testified that when asked what led to the killing, the defendant stated that he had been fighting the desire to have sexual contact with the victim for a long time. Further, the evidence indicated that neither the defendant nor the victim was wearing pants when the victim was killed. Also, there was circumstantial evidence that the victim was bound up before he died. Finally, the defendant took the victim to a remote, dark area. This court found that a reasonable jury could conclude the defendant did this in order to have sex with the victim unobserved. Thus, this court ruled the evidence was sufficient to support a finding that the defendant attempted aggravated criminal sodomy and the evidence was suf-

ficient to support the defendant's conviction for felony murder. This was so even though specific scientific evidence of sodomy was not introduced at trial. 248 Kan. at 399-404.

In *Arnold*, the defendant was convicted of attempted rape based on the following evidence. The victim spotted the defendant crouched behind her as she walked across a college campus. He had no shoes or shirt on. The defendant ended up on top of the victim. The defendant did not touch or tug on the victim's purse. He told her to be quiet or he would kill her. The defendant had one hand on the victim's mouth, trying to close her mouth, and choke her. The defendant placed one hand on the center of the victim's lower abdomen. The victim commanded the defendant to leave in the name of Jesus, and he did. The defendant argued that the evidence he intended to rape the victim was mere suspicion. He could have simply intended to rob her or beat up the victim, he argued. The Court of Appeals found, based on the defendant's stealth, the threats, and the position of the parties, that the jury reasonably drew the inference that the defendant intended to rape the victim. See 1 Kan. App. 2d at 643-44. The defendant's attempted rape conviction was upheld. See 223 Kan. 715.

Looking at the evidence herein, in the light most favorable to the prosecution, the evidence indicates that the defendant had previously made sexual advances toward L.R. On the evening of L.R.'s death, the defendant sexually assaulted Y.R. by holding her down and putting his hand over her mouth so she would not yell. He then sodomized Y.R. and touched her vagina. L.R.'s cause of death, asphyxiation, is consistent with someone putting his hand over her mouth and nose. When L.R. was found, her slip was pulled up, exposing her breasts, and her panties were pulled down, with her legs apart, very similar to the attack on Y.R. in that her panties were pulled down but not removed. She had suspicious brown marks on her vagina. There is evidence that L.R. struggled with her assailant. The blood found on L.R.'s halter top and slip could not be excluded as coming from the defendant.

Based on this circumstantial evidence, a rational factfinder could have found beyond a reasonable doubt that after the defendant sexually assaulted Y.R., he went into L.R.'s room to sexually assault

her later that night. He put his hand on L.R.'s mouth to prevent her from yelling, just as he had with Y.R. He then pulled down L.R.'s panties and pulled up her slip to sodomize or rape her. L.R. struggled with the defendant, causing drops of his blood to be found on her halter top and slip. In the struggle, the defendant continued to push down on L.R.'s nose and mouth to prevent her from alerting other people in the house, and this asphyxiated her. A rational factfinder could have found beyond a reasonable doubt that the defendant was guilty of felony murder based on an attempt to commit the underlying felony of rape or aggravated criminal sodomy. The evidence is sufficient to support the defendant's conviction for felony murder.

## II. VOLUNTARINESS OF STATEMENT AND CONSENT

Wichita police officers found the defendant at his sister's home in Arlington, Texas, 1 month after L.R. was found dead. Before leaving for Texas, the detective who planned to question the defendant asked around about whether the defendant had a language barrier problem. The detective was informed that the defendant spoke English very well and that people spoke both English and Spanish with him. The detective was aware that most of the defendant's family spoke only Spanish, but Arline told the detective that everyone living in her house, including the defendant, spoke English.

The police arrived at the defendant's sister's house in Texas at 3 a.m. on April 13, 1994. They observed the house until they saw light and movement in the house at 7 a.m. At this time, the police approached the house and asked to speak to the defendant. The police asked the defendant, in English, if he would accompany them to the Arlington police station for an interview. The defendant agreed. The defendant was not under arrest at this time.

At the police station, the police talked to the defendant in English, and, according to the questioning detective, the defendant acted as if he understood them. The detective specifically asked the defendant if he understood English and he said that he did. The defendant never said that he could not understand English. The detective read the defendant's *Miranda* rights to him in Eng-

lish from a card provided by the Arlington Police Department. After each warning, the questioning detective asked the defendant if he understood this right and each time the defendant responded, "Yes," in English. The defendant then initialed the *Miranda* card, as opposed to writing his whole name, just as the detective asked him to in English. The back of the *Miranda* rights card listed the *Miranda* rights in Spanish. However, the detective who read the defendant his rights was not aware of the Spanish version and could not have read the rights to the defendant in Spanish anyway because the detective did not speak Spanish. After having been read his *Miranda* rights in English, the defendant said he understood his *Miranda* rights and he agreed to talk without an attorney present.

Early in the interview, the detective asked the defendant in English if they could take blood, hair, and saliva samples from him. The detective read a waiver form to the defendant. The defendant dated and signed the waiver form and agreed to allow the samples to be taken. The detective took the defendant to a forensic lab and hospital to have his hair, saliva, and blood samples taken. The technicians collecting these samples spoke to the defendant in English, and he followed their instructions.

After the samples were taken, the interview continued. The detective asked questions in English, and the defendant responded in English. The defendant described his activities during the 2 days before his departure from Wichita in English. He gave detailed answers to the detective's questions. According to the questioning detective, the defendant's answers made sense in regard to the questions being asked and the two carried on a regular conversation. The questioning detective could only remember the defendant using one Spanish word throughout the entire interview. On the night L.R. died, the defendant said he checked L.R.'s bedroom to make sure she had not sneaked out of the house. When the defendant did this, he said L.R. called him the Spanish word for "asshole." The defendant used this term in the interview when describing L.R.'s response, and then he translated the Spanish word into English for the detective's benefit.

While the defendant did not have an interpreter at the interview in Texas, he did utilize an interpreter for the preliminary hearing and the trial.

Eventually, the defendant filed a motion to suppress his statement, alleging that he did not intelligently and voluntarily waive his *Miranda* rights or consent to the samples being taken because he was read his *Miranda* rights and asked for consent in English, not in Spanish, and without an interpreter.

The State presented the testimony of the questioning detective regarding the use of English at the interview. The defendant, using an interpreter, then took the stand. The defendant testified that his primary language was Spanish and that Spanish was the language his family used. He said he understood some English and that his brother Jose was fluent in English. According to the defendant, when the police found him at his sister's house, they did not arrest him, but they did tell him he had to go with them to the police station.

The defendant testified that the detective told him he had a right to remain silent, but that they also told him he had to speak. According to the defendant, the detective told him that there was no other way out so he had to talk. In regard to the detective's reading of the defendant's *Miranda* rights, the defendant testified as follows:

"Q. Did you ask for anybody to interpret it [the *Miranda* card] for you?
"A. They didn't give me a chance to do it.
"Q. Did you understand what it is that they were reading to you off that card?
"A. Not all very good."

The defendant also testified, through an interpreter, that the police told him he had to give a blood sample and that no one told him he did not have to give a sample. On cross-examination, the following exchange occurred:

"Q. You knew exactly what they were talking about when they asked you for blood, didn't you?
"A. Yeah. They told me they wanted blood, they told me they wanted blood and they wanted hair.
"Q. But, they didn't say that in Spanish, did they?
"A. No. They told me in English.

"Q. And you understood it?

"A. I understood it because I knew what they wanted.

. . . .

"Q. After the officers went through or the detectives went through this information with you, you carried on a conversation with them in English, did you not?

"A. Yeah, the little that I knew, yes.

"Q. Well, Officer O'Mara testified that you carried on a conversation in English with him. Would he be lying then?

"A. Not tell a lie, but—

"Q. But what?

"A. But I told him there were a lot of words that I wasn't going to understand, but he could explain them to me.

"Q. Did he ever have to—he didn't ever have to explain any words to you, though, did he?

"A. Say yes? Yes."

The defendant also testified that he had never been read his *Miranda* rights before, even though he had been arrested for DUI seven or eight times.

During the defendant's testimony, the State noted for the record that on three different occasions the defendant answered the question asked before it was interpreted for him, although all three of these questions were asking the name of the defendant, his brother, or the person who told the defendant he had to give blood.

Based on this evidence, the trial court denied the defendant's motion to suppress his statement and the sample results, finding that the defendant's rights were not violated.

Without an interpreter, the defendant contends that he did not knowingly and intelligently waive his *Miranda* rights or knowingly and intelligently consent to the samples being taken. As such, the defendant asserts that his statement and the samples should have been suppressed. Presumably, the defendant wants his conviction to be set aside and desires a new trial without the admission of the statement or sample results.

The State asserts that this issue must fail because the defendant did not object to the admission of the statement or the sample results at trial. See K.S.A. 60-404: "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed

and so stated as to make clear the specific ground of objection." See also *State v. Cheeks*, 258 Kan. 581, 593, 908 P.2d 175 (1995) ("A party must make a timely specific objection to the admission of evidence at trial in order to preserve the issue for appeal.").

In our examination of the record, we find no objection by the defendant to the admission of his interview statement or to the admission of the hair, blood, and saliva samples, and the defendant does not point to any such objection. Thus, this issue was not properly objected to at trial and is not properly raised on appeal. Even if the defendant had properly objected to the admission of this evidence at trial, this issue fails.

The defendant's brother told the questioning detective that the defendant spoke English well. Arline told the questioning detective that she and the defendant spoke English around the house. The defendant indicated to the questioning detective that he understood English and answered the questions as if he did. The defendant said he understood his *Miranda* rights and waived them. The defendant also signed a consent for blood and hair samples. The only Spanish term used by the defendant during the interview was the term for the word "asshole," which the defendant translated for the detectives. Throughout the 2½-hour interview, the defendant never indicated to the detectives that he did not understand English. Thus, the State asserts that the defendant knowingly and intelligently waived his *Miranda* rights, voluntarily made a statement, and voluntarily consented to the taking of the blood, hair, and saliva samples. As such, the State claims that the trial court properly refused to suppress the defendant's statement and sample results. We agree.

Waiver of *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances test. See *State v. Matson*, 260 Kan. 366, Syl. ¶ 4, 921 P.2d 790 (1996). The ultimate test regarding the admissibility of a statement is whether the statement was voluntary under the totality of the circumstance. See *State v. Morris*, 255 Kan. 964, Syl. ¶ 1, 880 P.2d 1244 (1994).

"If there is substantial competent evidence to support the trial court's findings that the defendant voluntarily, knowingly and intelligently waived his

Fifth . . . Amendment rights, such findings will not be disturbed on appellate review." *State v. Melton*, 207 Kan. 700, Syl. ¶ 2, 486 P.2d 1361 (1971).

"When a trial court conducts a pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily, and knowingly given, and admits the statement into evidence at trial, the appellate court should accept that determination if it is supported by substantial competent evidence." *State v. Snodgrass*, 252 Kan. 253, Syl. ¶ 1, 843 P.2d 720 (1992).

"If the findings of the trial court on a motion to suppress evidence are based on substantial evidence this court on review will not substitute its view of the evidence for that of the trial court. *State v. Chiles*, 226 Kan. 140, 144, 595 P.2d 1130 (1979)."

"When reviewing a trial court's suppression of evidence, the appellate courts normally give great deference to the factual findings of the trial court. The ultimate determination of the trial court's suppression of evidence is a legal question requiring independent appellate determination." *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 6, 891 P.2d 350 (1995).

While neither party cites it, K.S.A. 1996 Supp. 75-4351 governs the appointment of interpreters for persons whose primary language is not English. The statute emphasizes the public policy of providing interpreters to defendants whose primary language is not English during significant events of a criminal prosecution. *State v. Zuniga*, 237 Kan. 788, 791, 703 P.2d 805 (1985), discusses the applicability of the statute to a defendant who was arrested and interrogated in English, without an interpreter, even though his primary language was not English. The defendant challenged the admissibility of a statement he made during the interrogation, but this court upheld the trial court's admission of the statement into evidence. 237 Kan. at 791-92. In so holding, this court stated:

"K.S.A. 75-4351 and the sections that follow it provide the machinery for the selection, appointment and compensation of interpreters under various circumstances. They authorize the expenditure of public funds for that purpose. The statutes do not contain any sanctions for violations thereof. Suppression is a severe sanction, much criticized. While the purpose is to encourage peace officers to follow statutes or constitutional guidelines, it may prevent otherwise proper evidence from being introduced in the case at hand.

"There is no question here but that the statute was not complied with, and the trial court so found. When the statement was challenged, the trial court held a *Jackson v. Denno* hearing, out of the presence of the jury, to determine the admissibility of the statement. There was evidence that the defendant, a native of Mexico, had been in this country seven or eight years. He spoke English to the

victim. He apparently had no difficulty in understanding the speech of the officers and the directions given to him by them at the time of his arrest. Detective Clark first filled out a personal history sheet. All of the conversation was in English. Defendant never indicated that he could not understand. Both the arresting officers and Detective Clark read a statement of the *Miranda* rights to the defendant, and he appeared to understand those. When Detective Clark first questioned the defendant about the alleged rape, he denied that he had had intercourse with the victim. Later, he admitted that they had had intercourse, but stated that it was with her consent. Detective Clark wrote the statement out, read it to the defendant, and asked him if he wished to add, delete or change anything, and the defendant responded that he did not. The trial court held that the statement was admissible, finding that it was knowingly and voluntarily made with a knowing and voluntary waiver of the right not to speak." 237 Kan. at 791.

Based on these facts, we concluded in *Zuniga*:

"The trial court below conducted a full hearing on the matter and its determination is supported by substantial, competent evidence. We conclude that the trial court did not abuse its discretion or otherwise err in admitting in evidence Zuniga's statement to the officers." 237 Kan. at 792. See also *State v. Garcia*, 243 Kan. 662, Syl. ¶ 9, 763 P.2d 585 (1988) ("When an in-custody statement is taken in English from an accused whose primary language is not English, but who also speaks English, failure of the officers to have an interpreter in attendance pursuant to K.S.A. 75-4351[e] does not vitiate the statement if it was freely, voluntarily, knowingly, and understandingly made with full knowledge of the *Miranda* rights.").

In *State v. Nguyen*, 251 Kan. 69, 74, 833 P.2d 937 (1992), the defendant claimed that he did not voluntarily and knowingly waive his *Miranda* rights because he was not provided with an interpreter prior to making his statement. The defendant was born and raised in Viet Nam, and he informed the questioning police officer that he could understand a little English to a certain extent but not very well. However, the questioning police officer stated that when he was reading the *Miranda* rights to the defendant, he stopped after each right and the defendant said he understood. The defendant then signed the appropriate box on the waiver form. Apparently, the defendant's answers did not always relate to the questions asked, but by the end of the interrogation, the defendant's answers

and communication had greatly improved. This court noted that the trial court had the opportunity to observe the defendant communicate. Thus, this court found that substantial competent evidence supported the trial court's ruling that the defendant's statements were freely, voluntarily, knowingly, and understandingly made. 251 Kan. at 77-78.

There is substantial and competent evidence to support the trial court's finding herein that the defendant knowingly and intelligently waived his *Miranda* rights and knowingly and voluntarily consented to the hair, saliva, and blood samples. Further, under the totality of the circumstances, the defendant's statement and consent to the samples were freely, voluntarily, knowingly, and understandingly made. The duration of the questioning was short— only 2½ hours. The defendant appeared, from the record, to be of average intelligence. From the record, it does not appear that the defendant asked to communicate with others. The fairness of the interrogating officers depends on whose testimony is believed— the officers or the defendant. The trial judge believed the officers. Great deference should be given to the factual findings of the trial court. Substantial competent evidence supports the trial court's finding that the defendant's statement and consent to the samples were freely and voluntarily made. Thus, this court accepts the determination of the trial court and will not substitute its own view for that of the trial court. The defendant's statement and sample results did not need to be suppressed and were properly admitted into trial. This issue fails.

## III. DEPARTURE SENTENCES

At the time he was sentenced, the defendant had a prior record of several DUIs, driving with a suspended license, and driving without proof of liability insurance. Since the defendant had one non-person felony, a felony DUI based on three or more DUI misdemeanor convictions, he had a criminal history score of G. The sentence for the defendant's felony-murder conviction was life imprisonment. The presumptive sentence for the defendant's aggravated criminal sodomy conviction, applied consecutive to the life sentence, was a prison term of 86 to 96 months. The presumptive

sentence for the defendant's aggravated indecent liberties conviction, applied consecutive to the other two sentences, was a prison term of 46 to 51 months. The presumptive guidelines sentence for the defendant's conviction of attempted aggravated indecent liberties, applied consecutive to the other three sentences, was a prison term of 31 to 34 months.

The State moved for an upward durational departure sentence on the latter three crimes committed against Y.R. The State's motion for an upward departure gave the following reasons for the request:

"In support of its Motion the State would show:

1. The victim, [L.R.], was particularly vulnerable due to age which was known to the defendant.
2. The defendant's conduct during the commission of the offense of Felony Murder of [L.R.] manifested excessive brutality to the victim in a manner not normally present in that offense.
3. The defendant is a predatory sex offender convicted of crime of extreme sexual violence as defined in K.S.A. 1993 Supp. 21-4716 and amendments thereto.

WHEREFORE, the State submits that these are substantial and compelling reasons to depart from the presumptive sentence in this case and to impose double and consecutive sentences as allowed by law."

The trial court granted the State's motion for upward departure. The court, in imposing an upward durational sentence on the three crimes committed against Y.R., stated its reasons for departing as follows:

"[A]fter hearing testimony, [the court] finds that most of the testimony had to come through a nine-year-old girl who was a victim in this case. She was seven at the time . . . of the crimes that Mr. Salcido Corral was convicted of. She was very forthright and, I believe, very honest. She came across as a very good witness. I don't believe she was coached. She described many things that happened in her household, including the abuse that she—sexual abuse that she took from the defendant. . . .

. . . .

". . . And I believe in such a manner that it was very heinous. It was a brutal, brutal killing. It was actually asphyxiation, as testified to by the coroner. The DNA linked the defendant in this case. There is nothing that I can do to protect society except to keep Mr. Corral in the State penitentiary for the lengthy period of time I think he should be in there, and these were sexually related crimes, also, on

both victims, not just the one victim, so I will sustain the motion for an . . . upward durational departure."

In its judgment and order, the trial court listed its reasons for departure as follows:

"AGGRAVATING factors cited as a basis for departure sentence

Cts: 4, 5, & 6   The victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity which was known or should have been known to the offender.

Cts: 4, 5, & 6   The defendant's conduct during the commission of the current offenses manifested excessive brutality to the victim in a manner not normally present in that offense.

Cts: 4, 5, & 6   The defendant's current crimes of conviction are crimes of extreme sexual violence against both victims and the defendant is a predatory sex offender.

Cts: 1, 4, 5, & 6   Other: The defendant's current crimes of conviction were especially cruel, atrocious and heinous."

Count I is the felony murder, and Counts 4, 5, and 6 are the sex crimes committed against Y.R.

The court sentenced the defendant to life imprisonment for the felony murder conviction. The court departed upward on the sentence for the aggravated criminal sodomy conviction. Instead of sentencing the defendant to the presumptive sentence of 86 to 96 months in prison, the court doubled the highest guidelines sentence and sentenced the defendant to 192 months in prison for the aggravated criminal sodomy conviction. The court also departed upward on the sentence for the aggravated indecent liberties conviction. The court doubled the highest guidelines sentence and sentenced the defendant to 102 months in prison for the aggravated indecent liberties conviction. Finally, the court departed upward on the sentence for the attempted aggravated indecent liberties conviction. The court doubled the highest guidelines sentence and sentenced the defendant to 68 months in prison for attempted aggravated indecent liberties. The court ran all four sentences consecutive to each other and, in total, sentenced the defendant to life plus 362 months. The defendant challenges the departure sentences.

K.S.A. 21-4721 provides in pertinent part:

"(d) In any appeal from a judgment of conviction imposing a sentence that departs from the presumptive sentence prescribed by the sentencing grid for a crime, sentence review shall be limited to whether the sentencing court's findings of fact and reasons justifying a departure:

"(1) Are supported by the evidence in the record; and

"(2) constitute substantial and compelling reasons for departure.

. . . .

"(f) The appellate court may reverse or affirm the sentence. If the appellate court concludes that the trial court's factual findings are not supported by evidence in the record or do not establish substantial and compelling reasons for a departure, it shall remand the case to the trial court for resentencing."

An appellate court must give effect to the plain meaning of a statute as written, rather than attempt to determine what the law should or should not be. *State v. Gonzales*, 255 Kan. 243, 249, 874 P.2d 612 (1994).

The applicable standard of review for a departure sentence is keyed to the language of the statute: K.S.A. 21-4721(d)(1) requires an evidentiary test—are the facts stated by the sentencing court in justification of departure supported by the record? K.S.A. 21-4721(d)(2) requires a law test—are the reasons stated on the record for departure adequate to justify a sentence outside the presumptive sentence, *i.e.*, do the reasons supported by the record constitute substantial and compelling reasons for departure? *State v. Richardson*, 20 Kan. App. 2d 932, Syl. ¶ 1, 901 P.2d 1 (1995).

The trial court imposed life in prison for the felony-murder conviction. This was the only charge brought against the defendant in which L.R. was the victim. The trial court imposed a departure sentence on the three sex crime convictions. In all three sex crimes, Y.R., L.R.'s younger sister, was the victim. The aggravated criminal sodomy conviction punished the defendant for partially putting his penis in Y.R.'s rectum on the night of L.R.'s death. The aggravated indecent liberties conviction punished the defendant for touching Y.R.'s vagina on the night of L.R.'s death, and the attempted aggravated indecent liberties conviction punished the defendant for attempting to touch Y.R.'s vagina 1 month before L.R.'s death. An understanding of what crimes the district court departed upward on in sentencing and who was the victim of these crimes is impor-

tant because some of the departure factors relied on by the trial court apply to the felony murder of L.R. The court did not depart in sentencing the defendant for the felony-murder conviction because it was an off-grid crime.

Under the above standard of review, the first question is whether the reasons enumerated by the sentencing court as justifying sentencing departure are supported by evidence in the record. The first aggravating factor listed by the trial court is that the victim of the three sex crimes, Y.R., was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity, which was known or should have been known to the offender. Y.R. was 7 years old at the time these crimes were perpetrated against her. The defendant lived with Y.R.'s family and knew she was a young child. The evidence in the record supports the fact that the victim of the sex crimes, Y.R., was particularly vulnerable due to age when the crime occurred and that the offender knew her age and her vulnerability.

The second aggravating factor listed by the trial court as justifying departure is that the defendant's conduct during the commission of the current offenses manifested excessive brutality in a manner not normally present in such an offense. When the defendant attempted to commit aggravated indecent liberties against Y.R., he did not use excessive brutality in a manner beyond that normally present in such an offense. When the defendant sexually assaulted Y.R. the next time, the night L.R. died, he pulled down her pants, put his penis in her rectum, and rubbed her vagina. Y.R. eventually got away and ran into the living room to sleep next to her mother. There is no evidence that Y.R. had bruises, scrapes, or cuts on her face or body. In most sexual assaults, the attacker will try to prevent the victim from escaping the attack or from alerting others that a sexual assault is occurring. All sexual assaults are brutal. The legislature expressed an intent that the brutality be more than that normally present in such offenses. The evidence in the record before us does not support a finding that the defendant's conduct during the commission of the sex crimes manifested excessive brutality to Y.R. in a manner not normally present in such offenses. This aggravating factor does not support the trial court's

imposition of a departure sentence for each of the defendant's sex crime convictions.

The third aggravating factor listed by the trial court as justifying departure is that the defendant's convictions were crimes of extreme sexual violence against both victims and that the defendant is a predatory sex offender.

K.S.A. 21-4716(b)(2)(G) provides:

"[T]he following nonexclusive list of aggravating factors may be considered in determining whether substantial and compelling reasons for departure exist:

. . . .

"(G) The defendant's current crime of conviction is a crime of extreme sexual violence and the defendant is a predatory sex offender. As used in this subsection:

"(i) 'Crime of extreme sexual violence' is a felony limited to the following:

. . . .

"(c) a crime involving an act of sexual intercourse, sodomy or lewd fondling and touching with any child who is less than 14 years of age.

"(ii) 'Predatory sex offender' is an offender who has been convicted of a crime of extreme sexual violence as the current crime of conviction and who:

"(a) *Has one or more prior convictions of any crimes of extreme sexual violence.* Any prior conviction used to establish the defendant as a predatory sex offender pursuant to this subsection shall also be counted in determining the criminal history category." (Emphasis added.)

The defendant was convicted of aggravated criminal sodomy, one count of aggravated indecent liberties, and one count of attempted aggravated indecent liberties. All of these crimes involved an act of sodomy or lewd fondling and touching of a child who was less than 14 years of age. Thus, all three of the defendant's current crimes of conviction are crimes of "extreme sexual violence."

The defendant does not qualify, however, as having one or more *prior convictions* of extreme sexual violence. The defendant's criminal history category consists only of prior convictions for DUI, driving with a suspended license, and driving without proof of liability insurance. Since the defendant did not have one or more prior convictions of any crimes of extreme sexual violence, the defendant does not meet the statutory definition of a "predatory sex offender." This aggravating factor requires that the defendant's current crime of conviction be a crime of "extreme sexual violence" and that the defendant be a "predatory sex offender." Since the

defendant was not a "predatory sex offender," this aggravating factor is not supported by evidence in the record and cannot justify a sentencing departure.

The final factor listed by the trial court as justifying the departure sentences is that the defendant's current crimes of conviction were especially cruel, atrocious, and heinous. Clearly, the murder fits the definition of cruel, atrocious, and heinous. However, it occurred at a different time and to a victim other than Y.R. Y.R. was not aware the murder occurred until the following day. The defendant was given the maximum sentence for the murder. To use the murder under the facts of this case to enhance the sentence of a crime or crimes that occurred earlier and have no direct connection to the murder does not appear to us to come within the legislative guidelines for imposing an upward durational departure. See K.S.A. 21-4716(b)(2)(B); *State v. Cox*, 258 Kan. 557, 579, 908 P.2d 603 (1995).

Only one of the aggravating factors relied on by the trial court to justify the departure sentences is supported by evidence in the record. This factor is: The victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity which was known or should have been known to the offender. The next question is whether this aggravating factor constitutes a substantial and compelling reason for departure.

The defendant was convicted of aggravated indecent liberties and attempted aggravated indecent liberties, which required that the victim be under 14 years of age (K.S.A. 21-3504[a][3][A]), and the defendant was convicted of aggravated criminal sodomy, which required that the victim be under 14 years of age (K.S.A. 21-3506[a][1]). K.S.A. 21-4716(b)(3) provides:

"If a factual aspect of a crime [such as the age of the victim] is a statutory element of the crime [such as aggravated criminal sodomy and aggravated indecent liberties] or is used to subclassify the crime on the crime severity scale, that aspect of the current crime of consed as an aggravating . . . factor only if the criminal conduct constituting that aspect stituting that aspect of the current crime of conviction is significantly different from the usual criminal conduct captured by the aspect of the crime."

The trial court used the vulnerability of the victim, based on her young age, as an aggravating factor to justify a sentencing departure

for the three sex crimes of which the defendant was convicted. The young age of the victim was also a statutory element of all three sex crime convictions. There is nothing in the record to suggest that the 7-year-old victim in this case was any more vulnerable than any other 7-year-old would be. Thus, the vulnerability of the victim, based on her age, was an improper aggravating factor to justify the sentencing departures because the victim's age was already a statutory element of all three sex crimes. This aggravating factor does not constitute a substantial and compelling reason for departure.

Since all the aggravating factors relied on by the trial court to justify the sentencing departures are either not supported by evidence in the record or not substantial and compelling reasons for departure, the departure sentences were improper.

"If a departure sentence is issued, the court shall state on the record at the time of sentencing the substantial and compelling reasons for the departure. [K.S.A. 21-4716(a)]. The court's comments at the time of sentencing govern as to the reasons for departure." *State v. Gideon*, 257 Kan. 591, Syl. ¶ 21, 894 P.2d 850 (1995).

"An appellate court's review pursuant to [K.S.A. 21-4721(d)] is limited to the findings of fact and reasons justifying departure specifically enunciated by the sentencing court. An appellate court reviewing a sentencing court's reasons for departure will not conduct a broader search of the record to examine all facts available to the sentencing court to determine whether there were substantial and compelling reasons for departure." *Richardson*, 20 Kan. App. 2d 932, Syl. ¶ 3.

The aggravating factors enunciated by the trial court were not sufficient to justify departure, and this court will not review the record for aggravating factors which might have justified departure if enunciated.

We affirm the four convictions and the sentence for felony murder. We vacate the sentences for aggravated sodomy, aggravated indecent liberties with a child, and attempted aggravated indecent liberties with a child.

Convictions affirmed, sentences vacated in part, and case remanded for resentencing as to the three sex crimes.