No. 76,616

STATE OF KANSAS, *Appellee,* v. DUANE HENRY, *Appellant.*
(947 P.2d 1020)

Opinion filed October 31, 1997.

*Jessica R. Kunen*, chief appellate defender, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Duane Henry's direct appeal of his jury conviction for premeditated first-degree murder of Sheila Winter and his subsequent sentence to life imprisonment.

Henry raises five issues: (1) Did the issuing magistrate have a substantial basis for concluding probable cause existed to issue a search warrant for the seizure of Henry's blood and hair samples? (2) Did the trial court properly deny Henry's motion to dismiss which alleged insufficient evidence of premeditation was presented at the preliminary hearing? (3) Was it an abuse of discretion to refuse to admit an FBI agent's written report when the agent testified as to the contents of the report at trial? (4) Was the trial court's failure to give an unrequested informant cautionary instruction clearly erroneous? and (5) Did the trial court abuse its discretion in denying Henry's request for a new trial based on a claim of newly discovered evidence?

Although the complicated facts and resulting issues in this case were argued to us in excruciating detail, we easily determine there is no merit to any of Henry's contentions and his conviction must be affirmed.

We will summarize the tragic facts involving the unsavory drug culture that resulted in the finding of 17-year-old Winter's body by her boyfriend, Adam Elam, in her Lenexa apartment on Thursday, May 16, 1991. She had been beaten, stomped, and strangled, and her throat had been cut.

At some point in 1990, Winter moved out of her parents' home and was befriended by a 19-year-old co-worker, Tiffany Baird. They became regular dancers at various strip clubs in Kansas City and Lawrence. Winter also began using and selling drugs, frequently attended parties where drugs and alcohol were present, and had sexual relations with numerous men, including Henry.

Several weeks before her death, Winter began a sexual relationship with Elam. Elam spent the Sunday, Monday, and Tuesday

nights prior to Winter's death at her apartment, but they engaged in no sexual activity on Tuesday, as Winter complained of intense lower abdominal pain. On Wednesday afternoon, Winter consulted Dr. Paul Reikhof, who performed a pelvic examination and diagnosed Winter with three venereal diseases.

Dr. Reikhof's testimony at Henry's trial concerning this examination was critical to the State's case. He testified there was no semen present at the time of his examination and no indication of recent intercourse. He indicated a spermicidal lubricant was used during the exam, which formed the basis for Henry's request for a new trial, the last issue in this appeal. Finally, Dr. Reikhof opined that he seriously doubted semen detected during Winter's autopsy 24 hours after his exam could have been deposited prior to his exam.

After her doctor's appointment, Winter and Baird went to Lawrence to dance that evening. Before reporting to work, they smoked marijuana at the house of two acquaintances, Shane Crady and Brett Amrien, who later gave them LSD at work. Winter called Elam from the club and told him she was staying in Lawrence to party with friends. The women returned to Crady and Amrien's house and partied until early in the morning. Sometime after 4 a.m., Winter had sex with Crady.

Leaving Lawrence around 7 a.m., Winter dropped off Baird, stating she was going to nap until noon, then work the day shift at a club; she then returned to her apartment. Between 8:30 and 9 a.m., Elam called Winter, and they planned to eat lunch together.

Around 11:30 that Thursday morning, Elam received a call at work from Winter, who sounded distraught, appeared to have her hand over the phone as if someone was there, and said, "Just please just come over." When Elam arrived at Winter's apartment around 12:15 p.m., no one answered his knock, and he discovered her lying on the floor, covered with blood. Elam dialed 911 and the police arrived, finding Winter's unclothed body in a pool of blood, wrapped in blankets and pillows. There was no sign of forced entry and/or burglary of the apartment.

The autopsy report indicated Winter had died from asphyxiation, secondary to strangulation, with multiple blows of blunt and sharp

injuries to the neck and head. Swabs taken of Winter's vaginal vault during the autopsy were tested for genetic characteristics and revealed the presence of semen matching the profile of Crady, but did not rule out the presence of multiple semen donors. After a blood sample was obtained from Henry following execution of a search warrant, simple testing failed to reveal his PMG markers, but additional DNA testing found sperm cells consistent with Henry's DNA. The DNA expert, Linda Harrison, testified that 99.99% of the Caucasian population would be excluded from sharing a genetic profile with Henry. No other genetic tests were made on other physical evidence, nor was a match found between Henry's hair and foreign hairs taken from Winter's body.

Evidence concerning this DNA evidence was critical at Henry's trial, and several experts testified regarding the viability of sperm and its DNA. Dr. Reikhof indicated that sperm could remain alive for 72 and up to 96 hours. Gary Dirks, a forensic chemist specializing in serology, testified that sperm breaks down within 48 hours in a living individual, and that he had never heard of an instance where DNA was able to be detected after 48 hours except in a frozen environment. Linda Harrison also stated that semen remains viable for approximately 48 hours before it breaks down. Defense expert Dean Stetler, professor of biochemistry at the University of Kansas, said that although sperm could remain viable for 96 hours to 6 days, sperm DNA could still be extracted for a period of a week, maybe 2 weeks.

Although Henry was not initially linked to Winter's death, he was a member of a group of men engaged in the drug business and known as the Young Italians, which included Joe Pat Balano, Tony Mike Nigro, and Anthony D'Angelo. In the spring of 1992, Henry and the other Young Italians were convicted of and imprisoned for various federal drug crimes following a large FBI drug raid. Henry pled guilty and agreed to testify against other individuals in the drug conspiracy case.

During the investigation of Winter's death, the police became aware that the Kansas City, Missouri, police were investigating the March 19, 1991, shooting death of Jill LaMarre. Henry became a suspect in the deaths of both LaMarre and Winter in the aftermath

of the federal drug conspiracy case. Anthony D'Angelo told agents that Henry had called him and said he needed D'Angelo to provide him with an alibi for the period of Winter's death. D'Angelo received a reduction in his federal sentence for providing this information. Henry agreed to take a polygraph examination concerning his involvement in the crimes. Although he denied all responsibility for either murder, the examiner held the opinion that his responses indicated deception.

In May 1992, law enforcement agents interviewed a confidential informant (C.I.) from a jail in Osceola, Missouri, who had overheard Nigro and Balano telling other inmates that a girl named Jill had stolen cocaine from Nigro and that Nigro had directed Henry to have her killed. Henry supposedly received payment in cocaine. The C.I. also overheard Nigro say Henry and another person had beaten a 17-year-old dancer to death. The C.I. had previously provided reliable information in a murder-for-hire case and on narcotics trafficking in southern Missouri and in prison. The C.I. was not from the Kansas City area and had no prior knowledge of either the LaMarre or Winter murders.

Much of this information was included in an affidavit, written in April 1993 by the lead detective in the LaMarre homicide investigation, which requested a search warrant to obtain Henry's blood and hair for examination. The magistrate granted the warrant, and the seized samples revealed a DNA match with the semen from Winter's body.

In January 1994, another informant, Kevin Cummings, who was imprisoned with Henry, notified the police that Henry had told him he had killed Winter.

Henry was charged with first-degree premeditated murder on June 7, 1994. At the preliminary hearing held in January 1995, Elam, Baird, and Cummings testified, and the application for the search warrant and the autopsy report were offered as exhibits. Cummings testified that Henry spoke about his involvement in Winter's death five to ten times. According to Cummings, Henry stated he was with Winter the night prior to her death, another individual arrived, they questioned her about money owed them, the conversation turned violent, and things "just got out of control,

and before he even realized what had happened, she was down on the ground, they were stomping on her and stuff. . . . [B]y the time they had realized what they had done, it was already too late." Cummings also testified that Henry had said Winter "was a coke whore and a tramp, you know, she deserved what she got."

The defense pointed out the discrepancies in Cummings' testimony and called him a "federal snitch who can't get his facts straight," but the court concluded there was probable cause to believe Henry had committed a felony and bound him over.

Henry moved to dismiss, alleging insufficient evidence of premeditation was presented at the preliminary hearing. The defense stipulated at a hearing that enough evidence existed to bind Henry over on involuntary manslaughter, but not first- or second-degree murder or voluntary manslaughter. The court's denial of this motion is the basis for one of Henry's issues herein.

Henry also moved to suppress the evidence from the blood and hair seized during the execution of the search warrant, alleging the affidavit lacked a sufficient basis to find probable cause, was based on uncorroborated hearsay and inadmissible polygraph evidence, failed to set forth facts supporting the credibility and reliability of the confidential informants, and made allegations containing deliberate falsehoods or in reckless disregard of the truth.

The court held a *Franks v. Delaware*, 438 U.S. 154, 57 L. Ed. 2d 667, 98 S. Ct. 2674 (1978), hearing in which the investigating officers testified for the State and stated they believed the information in the affidavit was true when they applied for the warrant. Testimony also indicated that had the warrant not been issued, a search warrant would have been applied for and obtained after the information from Cummings was obtained in early 1994.

After hearing the evidence, the court determined Henry had made no showing that the affidavit contained intentional falsehoods or material omissions. It also decided that from the four corners of the affidavit, the issuing magistrate could have reasonably found probable cause to issue the warrant.

Prior to trial, the parties became aware that Cummings had been granted an 18-month reduction of his federal sentence for providing information about Winter's death. At a hearing, the prosecutor

testified he had been unaware that the United States had moved to reduce the sentence and he believed Cummings was under the impression that his sentence had been reduced due to information he had provided in a different case, not this one.

At trial, the events and facts surrounding Winter's death were established as set out above, but no mention was made of the LaMarre homicide. D'Angelo testified regarding Henry's request for an alibi following the murder. The State did not call Cummings to the stand. Instead, it called another informant, Mike Lipp, who had also been imprisoned with Henry.

Lipp testified he had been convicted of and was serving time for various drug offenses and 24 years earlier he had been convicted of murder in a drug deal that went bad. Lipp stated Henry had told him how he had killed Winter. He related that Winter would trade sex with Henry for drugs and that on the day she was killed, Henry did not have drugs to give her and she got angry. Henry then started beating and choking her until he killed her. He told Lipp that Winter "was a coke whore and she deserved it." Lipp claimed he was testifying because he had a daughter the same age as Winter, he had not received a sentence reduction, although his case was on appeal, and he was putting himself at risk by testifying against Henry.

Henry testified on his own behalf and admitted to having a sexual relationship with Winter, but he could not remember when he had last had sex with her. He denied having had intercourse with Winter immediately prior to her murder and testified he had not killed her. He could not remember what he had been doing during the time when Winter was killed.

The court instructed the jury on first- and second-degree murder and voluntary manslaughter. The jury convicted Henry of first-degree premeditated murder. His motions for judgment of acquittal and for a new trial based on newly discovered evidence were denied. The motion for new trial included an affidavit that KY Jelly does not contain a spermicide, contrary to what was alleged at trial, although a second product, KY PLUS Spermicidal Lubricant does contain one. The motion alleged that Dr. Reikhof's office uses the

nonspermicidal type and that this was new information which had not been previously available.

Henry was sentenced to life imprisonment, to run consecutive to his prior sentences. Henry appeals, raising the issues we have previously set forth.

*Propriety of search warrant*

Our general rule when faced with questions involving the issuance of a search warrant are set forth in *State v. Gilbert*, 256 Kan. 419, Syl. ¶¶ 2, 3, 4, 886 P.2d 365 (1994):

> "Before a warrant for arrest or search may be issued, there must be a finding of probable cause by a neutral and detached magistrate. The complaint and supporting affidavits should supply the magistrate with sufficient factual information to support an independent judgment that probable cause to arrest exists."
>
> "In determining whether to issue a warrant for arrest or search, a magistrate should consider the 'totality of the circumstances' presented and make a practical, common-sense decision whether there is a fair probability that a crime has been committed and the defendant committed the crime, or that contraband or evidence of a crime will be found in a particular place."
>
> "On appeal, the duty of a reviewing court is to ensure that the magistrate had a substantial basis for concluding that probable cause existed. In making its determination, a reviewing court is required to pay great deference to the issuing magistrate's finding of probable cause for the issuance of a warrant, and such after-the-fact scrutinizing should not take the form of a de novo review."

Although a persuasive argument could be made that the alleged falsehoods set forth in Henry's suppression motion were insufficient to require a hearing or invalidate the existence of probable cause, an evidentiary hearing was held in accordance with *Franks* and the Kansas case of *State v. Jacques*, 225 Kan. 38, 587 P.2d 861 (1978), to ascertain whether the affidavit by the government agent in support of the warrant contained false statements made knowingly, intentionally, or with reckless disregard of the truth. See *State v. Jensen*, 259 Kan. 781, 787, 915 P.2d 109 (1996). We review the trial court's findings from the *Franks* evidentiary hearing with the same standard applied when reviewing a motion to suppress evidence: "If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, this court on review will not substitute its view of the evidence for that of the trial

court." *State v. Salcido-Corral,* 262 Kan. 392, Syl. ¶ 6, 940 P.2d 11 (1997).

In addition to Henry's challenge regarding the veracity of the affidavit, he also attacks the legal sufficiency of the information included within it. He contends the reliability of the confidential informant was not established, Nigro and Balano were not credible informants, a statement regarding the inadmissible polygraph test should not have been included, and the magistrate was not provided with sufficient information regarding the motives of the parties making the allegations against Henry.

We have adopted the totality of the circumstances analysis set forth in *Illinois v. Gates,* 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983), for judging the credibility and reliability of information obtained from a confidential informant. *State v. Toler,* 246 Kan. 269, 787 P.2d 711 (1990). Under the prior tests of *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969), and *Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964), an affiant was required first to show the basis of the informant's knowledge and second to establish either the veracity of the informant or the reliability of the information. *Toler,* 246 Kan. at 272. Under the totality of the circumstances test, however, a deficiency in one prong of the two-pronged test is not fatal and may be compensated for by determining the overall reliability of the tip or by some other strong indicia of reliability.

Contrary to Henry's assertions, the affidavit clearly sets forth sufficient facts to judge the reliability and veracity of the informant who had previously provided reliable information resulting in three successful prosecutions. The affidavit also describes corroborated information concerning Balano's and Henry's whereabouts the night of LaMarre's murder and reveals the C.I.'s knowledge of Henry's association with both victims. The affidavit showed the C.I. had no prior knowledge about the killings, confirming that the C.I. would not have known of these matters without having been incarcerated with Nigro and Balano. Henry's additional claim that the affidavit failed to inform the magistrate that Henry was cooperating in a drug trafficking case in which Nigro and Balano were defendants was not made at the suppression hearing and may not

now be argued on appeal as a ground for invalidating the search warrant. See *Toler*, 246 Kan. at 274.

Henry further argues that information obtained by the police during investigatory interviews must be subject to the same rigors as that of confidential informants. This is contrary to *State v. Aikins*, 261 Kan. 346, Syl. ¶ 4, 932 P.2d 408 (1996), where we said that statements of citizen informers are not viewed with such rigid scrutiny as the testimony of a police informer. The fact that Henry's name was mentioned in an investigatory interview is relevant and was properly included, even though such information may have conflicted with that obtained in other interviews.

Henry next complains of the hearsay information provided from one officer to another. It is a well-established rule that probable cause may be supported in part by hearsay information. *Aikins*, 261 Kan. at 356. Additionally, the United States Supreme Court has declared that observations of fellow officers engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number. *United States v. Ventresca*, 380 U.S. 102, 111, 13 L. Ed. 2d 684, 85 S. Ct. 741 (1965).

Henry also alleges that statements regarding the polygraph test should not have been included in the affidavit for the search warrant, as such tests are inadmissible at trial. This issue is not the same as whether such tests are admissible at trial, where we are concerned that polygraph tests will invade the province of the jury. The unreliability of polygraph tests remains a consideration, although in this case the test results were not a determining ground for the search warrant application. When deciding if the totality of the circumstances supports a finding of probable cause, inclusion of facts pertaining to a polygraph test will not invalidate the issuance of a search warrant.

As to the matters which Henry alleged were false, each of these were considered in the *Franks* evidentiary hearing, and the trial court concluded there were no intentional false statements or material omissions. Yet, even fully granting the alleged falsehood of these matters, the trial court still could rely on the following facts in the affidavit to support a finding of probable cause: (1) LaMarre and Winter had both been killed; (2) Henry was linked to both

parties; (3) Henry was involved in drug trafficking; (4) semen samples and foreign hairs were recovered from the bodies of both women; (5) a confidential informant who had proven reliable in the past and who had no prior knowledge of the persons involved told investigators that Henry had participated in the deaths of LaMarre and Winter; (6) although brought to the area the year following the murders, the confidential informant knew where Henry claimed to be the night of LaMarre's death and knew details about Winter's death; (7) Winter had told someone prior to her death that Henry had killed LaMarre; and (8) Henry had participated in the beating death of another individual.

Under the totality of the circumstances, these bare facts, regardless of the involvement of other possible suspects, indicate two crimes had been committed, there was a fair probability Henry committed the crimes, and relevant evidence could be obtained by executing a search warrant. Although a *Franks* hearing might not have been required because probable cause clearly existed even after the affidavit was altered in conformance with Henry's allegations, the findings of the trial court regarding the alleged falsehoods are clearly based on substantial evidence. Thus, we will not on review substitute our view of the evidence for that of the trial court. The search warrant requiring Henry to submit hair and blood samples through accepted medical procedures was entirely proper.

*Probable cause at preliminary hearing*

Henry contends the evidence was insufficient at the preliminary hearing to show that the murder of Winter was premeditated.

In *State v. Butler,* 257 Kan. 1043, 897 P.2d 1007 (1995), we set forth our standard for reviewing alleged errors at the preliminary hearing after a defendant has stood trial and been convicted. We held: "[W]here an accused has gone to trial and been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is harmless unless it appears that the error caused prejudice at trial." 257 Kan. at 1062.

A preliminary hearing is not a trial of the guilt or innocence of a defendant, but rather is an inquiry to determine if it appears a

felony has been committed and there is probable cause to believe that a felony has been committed by the defendant. "Probable cause at a preliminary hearing signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain reasonable belief of the accused's guilt." 257 Kan. at 1059.

Henry's argument that the oral testimony of Baird, Elam, and Cummings at the hearing fails to establish premeditation does not mention or address the autopsy report revealing Winter's numerous injuries, including blunt head trauma, strangulation, multiple cuts to the neck, and defensive wounds. No evidence was admitted of provocation to warrant these injuries, and testimony later admitted at trial indicated Winter may have been rendered unconscious before death occurred.

There is ample evidence that may be inferred from the extent of Winter's injuries to conclude that her death was premeditated. See *State v. Moncla,* 262 Kan. 58, 73, 936 P.2d 727 (1997) (18 hammer strikes to the head sufficient to show premeditation and deliberation); *State v. Brown,* 234 Kan. 969, 973, 676 P.2d 757 (1984) (severe beating of victim who died from strangulation sufficient for factfinder to determine killing was deliberate, premeditated, willful, and intentional). We held in *Moncla* that while the element of premeditation is not inferred from use of a deadly weapon alone, an inference of premeditation may be supported where additional circumstances are shown, including lack of provocation, conduct before and after the killing, or the striking of a lethal blow after the deceased was rendered helpless. Under the facts in this case, such was shown at the preliminary hearing. No error was committed in binding Henry over for trial or in denying Henry's motion.

*Exclusion of written FBI report*

Henry's assertion that the trial court erred by refusing to admit the written report of FBI Special Agent Tongate into evidence after he had testified as to its specific contents is without merit. We have recently written on an identical issue in *State v. Griffin,* 262 Kan. 698, 700-02, 941 P.2d 941 (1997). We there held the admissibility of a written report is a matter of judicial discretion, and the trial

court will not be reversed on appeal absent a showing that its actions were arbitrary, fanciful, or unreasonable.

In this case, Agent Tongate testified concerning a prior statement made by D'Angelo regarding the time period for which Henry allegedly had requested an alibi. Although at trial, D'Angelo did not specifically deny making the statement, Henry was permitted to cross-examine Tongate about it. The statement was read directly from the agent's report into the record and became a part of the agent's testimony.

It is clear that admission of the actual report after its contents had been read to the jury would merely have been cumulative. Trial courts have wide discretion in excluding cumulative impeaching evidence. See *State v. Schlicher*, 230 Kan. 482, 493, 639 P.2d 467 (1982). The exclusion of this report was not arbitrary or unreasonable.

*Informant cautionary instruction*

Henry next claims the trial court erred in failing to give an informant cautionary instruction, although he admits that he did not request the instruction or object to the failure to so instruct. Our clear rule, recently restated in *State v. Isley*, 262 Kan. 281, Syl. ¶ 4, 936 P.2d 275 (1997), is that no party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds of his or her objection, unless the instruction or the failure to give the instruction is clearly erroneous. K.S.A. 22-3414. Instructions are clearly erroneous only if the reviewing court is firmly convinced that there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred.

The instruction Henry now alleges should have been given is PIK Crim. 3d 52-18A, which reads: "You should consider with caution the testimony of an informant who, in exchange for benefits from the State, acts as an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence."

In the present case, the evidence against Henry was not solely based upon the uncorroborated testimony of the informants. The most damaging evidence came from the match of Henry's DNA with semen in Winter's body, the testimony from multiple experts that semen DNA breaks down within 48 to 96 hours, and Henry's statement that he was not with Winter anytime during the week prior to her death. Further, there was evidence from Baird corroborating Lipp's story that Henry had previously provided drugs to Winter in exchange for sex.

In addition, all evidence regarding sentence reductions received by the testifying informants was presented to the jury. The jury was well aware of the records of these prison informants and their possible motives for testifying. The court also instructed the jury that it could determine the weight and credit to give the testimony of each witness and that it had the right to use its common knowledge and experience in regard to the matter about which the witness testified.

In light of these factors, we find there is no real possibility that the jury would have rendered a different verdict had the informant cautionary instruction been given. The failure to so instruct was not clearly erroneous.

### Newly discovered evidence

Henry's final argument is that newly discovered evidence required a new trial because the lubricating jelly used during Winter's gynecological exam did not contain a spermicide, as had been alleged at trial.

In *State v. Thomas*, 257 Kan. 228, Syl. ¶ 3, 891 P.2d 417 (1995), we stated:

"The appellate standard for reviewing a trial court's order under K.S.A. 22-3501(1) on a motion for new trial based on newly discovered evidence is abuse of discretion, regardless of whether a full hearing with live testimony is held. Under the abuse of discretion standard, if a reasonable person could agree with the trial court's decision it will not be disturbed on appeal."

In deciding whether a new trial is warranted, the defendant bears the burden of proving that the evidence is in fact "new" and could not have been produced at trial with reasonable diligence,

and this evidence must be of such materiality that a reasonable probability exists that it would result in a different outcome at trial. *State. v Matson,* 260 Kan. 366, Syl. ¶ 6, 921 P.2d 790 (1996).

Henry argued that he was unable to discover the fact that the KY Jelly used during Winter's exam did not contain a spermicide until after the jury began deliberations. He claimed this evidence was material because it was used to reinforce the contention that Henry had lied about the last time he had had intercourse with Winter and that he had been with her the day of her death. The trial court found that this evidence could have been discovered with due diligence and was not material.

Information concerning the type of lubricating jelly used was discoverable at the time of trial and, simply stated, appears to be a question which Henry could have inquired about, but did not. The trial court did not abuse its discretion in finding the evidence could have been produced with due diligence. We need not determine whether this evidence was of such materiality that a reasonable probability exists that it would have resulted in a different outcome at trial.

Affirmed.